H. Max AMMERMAN et al., Appellants,

v.

CITY STORES COMPANY, Appellee.

No. 21097.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 18, 1967.

Decided April 4, 1968.

Mr. Edgar H. Brenner, Washington, D. C., with whom Messrs. Thurman Arnold, Melvin Spaeth and Michael Schneiderman, New York City, were on the brief, for appellants.

Mr. Robert Martin, Washington, D. C., with whom Messrs. Lloyd Symington, Marx Leva, Richard Shlakman and Richard K. Lyon, Washington, D. C., were on the brief, for appellee.

Before DANAHER, TAMM and ROBINSON, Circuit Judges.

PER CURIAM:

Appellants, builders and developers of Tyson's Corner Shopping Center in Fairfax County, Virginia,[1] challenge the District Court's decision (1) that the builders had given City Stores Company, owners of Lansburgh's Department Store, a binding option to lease one of the major buildings to be constructed at the contemplated shopping center and (2) that the option-lease agreement is sufficiently definite and certain in terms of design, type of construction, and price to be specifically enforced.[2]

---

1. The principal appellant is the partnership of Tyson's Corner Regional Shopping Center, made up of Messrs. Lerner and Ammerman, their wives, and the Gudelsky Company, which succeeded to the interest of Mr. Gudelsky when he died in 1963.

2. The opinion of District Judge Gasch appears as City Stores Co. v. Ammerman, 266 F.Supp. 766 (D.D.C.1967). He had presided at all proceedings in the District Court, so that evidence received upon the application for a preliminary injunction became part of the trial record. FED.R.CIV.P. 65(a) (2).

The appellants in their statement of points have here contended that the District Court erred: in ordering specific performance in that the existence and terms of the contract had not been established by clear and convincing evidence; in granting equitable relief despite the appellants' claim that the appellee had been guilty of "laches and unclean hands"; and in ordering specific performance of the contract since some substantial details will require future negotiations and yet others are said to be unclear or can not be performed.

At the core of the dispute is an undated letter (text, *infra*), from the appellants to one Jagels, then President of Lansburgh's, given at a time when the builders were attempting to obtain a ruling from the Fairfax Board of County Supervisors which would permit the rezoning of their tract of land for use as a shopping center. Prospects for a favorable outcome at a May 31, 1962, hearing, then yet in the future, were in doubt. The county planning commission and the planning staff · had already recommended against the appellants' application, and another group of developers, Rouse-Reynolds, had a similar petition before the Board for a different center but in the same general area.

 In early 1962, during the course of negotiations with Messrs. Gudelsky and Lerner for a lease at one of their developments in Maryland, Lansburgh's president, Jagels, had expressed an interest in the Tyson's Corner project. Thereafter Lerner requested a letter from Jagels, expressing Lansburgh's preference for appellants' site over the Rouse-Reynolds tract, which the builders could use in the Fairfax zoning hearing. Although Lansburgh's would ordinarily have been unwilling to risk offending the Rouse-Reynolds group by committing itself to the Gudelsky-Lerner project,[3] it was eager to improve its declining economic position in the Washington area by expanding into the suburbs. Jagels provided the requested letter[4] which the appellants subsequently presented at the rezoning hearing to support their application.[5]

3. Other major department stores, e.g., Hecht and Woodward & Lothrop, had refused to give such a commitment to the appellants' site.

4. The text of the Jagels letter is reprinted in full:

> May 29, 1962
>
> Dear Mr. Gudelsky and Mr. Lerner:
>
> In view of our several discussions on the Tyson's Corner area as a place for a Regional Shopping Center, I am pleased to say that we have now completed our rather exhaustive surveys and are in a position to give you our firm position on the subject.
>
> We are convinced that the Gudelsky-Lerner tract, to which you refer as the Tyson's Triangle, is superior to any other. Being located on the Beltway, it has an unexcelled advertising value. Its location on both Route 7 and Route 123 gives it access to all local traffic.
>
> Since the Tyson's Triangle site will be developed almost exclusively to commercial uses, it also assures a live center with no dead spots. It is also readily available to automobile traffic without other competing uses within the Triangle.
>
> If you and your associates gain approval to build a Regional Shopping Center on this property, Lansburgh's would be very interested in becoming a major tenant with a full line department store. This interest is, however, restricted to this particular location only and is further conditional upon their being only one regional center in the Tyson's Corner area.

5. The trial court rejected the contention that Jagels wrote the letter to get the appellants' help in becoming a tenant of their Maryland shopping center. Another meritless argument is that the agreement is void as against public policy because the sole consideration for it was an attempt to influence the decision of a public body and is proscribed by Hazelton v. Sheckels, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939 (1906) (Holmes, J.); *cf.* United States v. Mississippi Vallee Generating Co., 364 U.S. 520, 550 n. 14, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). Aside from a failure to raise the issue below, the contention suffers the infirmity that *Hazelton* is inapplicable since it was not City Stores but the apellants who used the letter to influence the decision of a public body. The agreement embodied no "improper interest or dangerous tendency" that personal influence would be used to procure legislation. *See* Valdes

Judge Gasch agreed with the appellee that the Jagels letter was given in exchange for a promise that Lansburgh's be given an opportunity to become a major tenant at Tyson's Corner on terms equal to those given other major tenants. The trial judge further found that this promise had been memorialized in the following undated letter given to Mr. Jagels on or about May 29, 1962 [6]:

Dear Mr. Jagels:

We very much appreciate the efforts which you have expended in endeavoring to assist Mr. Gudelsky and me in our application for zoning at Tyson's Corner for a Regional Shopping Center.

You have our assurance that in the event we are successful with our application, that [sic] *we will give you the opportunity to become one of our contemplated center's major tenants with rental and terms at least equal to that of any other major department store in the center.* [Emphasis added.]

Sincerely yours,

/s/ Isadore M. Gudelsky

/s/ Theodore N. Lerner

v. Larrinaga, 233 U.S. 705, 709–710, 34 S.Ct. 750, 58 L.Ed. 1163 (1913) (Holmes, J.); *cf.* Muschany v. United States, 324 U.S. 49, 64–65, 65 S.Ct. 442, 89 L.Ed. 744 (1945).

6. The statute of frauds for the District of Columbia reads in pertinent part:

> An action may not be brought * * * to charge a person upon * * * a contract or sale of real estate [or] of any interest in or concerning it * * * unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing, which need not state the consideration and signed by the party to be charged therewith * * *. D.C.Code § 28–3502 (1967).

The letter signed by these builders, together with appellee's full performance of the requested services, is sufficient evidence of a unilateral contract to satisfy this statute. *See* 4 S. Williston, Law of Contracts § 571, at 53–55, 58–59 (Jaeger ed. 1961); *cf.* Schanck v. Jones, 97 U.S.App.D.C. 148, 229 F.2d 31 (1956). The appellee's change of posi-

## I

Deeming the assistance afforded by the appellee to the appellants, particularly the May 29, 1962 letter, to be adequate consideration for a valid unilateral contract binding on the appellants, Judge Gasch considered whether the contract, so found, was an option. He noted that an option contract, defined as "a continuing offer for a fixed [or reasonable] period of time * * * which is binding on the offeror because given for a valuable consideration," [7] usually describes in particularity what is offered. But he also recognized that "option" is a business concept,[8] not a narrow legal term.

■ At the time the contract was made, the builders themselves had no more than a "chance" or "opportunity" to succeed in their Tyson's Corner rezoning project. That it may thus have seemed futile to specify in detail the terms of the agreement, did not preclude a ruling that the Gudelsky-Lerner letter evidenced in Lansburgh's favor a legally binding option to take a lease at the shopping center. The District Judge, finding that an exercise of the

tion induced by the appellants' parol promise would estop the latter from setting up the statute of frauds. Brewood v. Cook, 92 U.S.App.D.C. 386, 389, 207 F.2d 439, 441 (1953). *See generally* 2 A. Corbin, Contracts § 498, at 679–81 (1950).

7. 266 F.Supp. at 771.

8. *See* 5 S. Williston, Law of Contracts § 1441 (rev. ed. 1937). The appellants' semantic and philological argument that "opportunity to become a tenant" does not mean "option to become a tenant" is interesting but without merit. *See* 1A A. Corbin, Contracts § 261A (1963). If there is any validity to their position here, they breached even this lesser obligation, in view of the failure of appellants' counsel to give a satisfactory answer at oral argument to inquiry from the bench, put twice at different times and in different words: "When, and in what way did Messrs. Gudelsky and Lerner give Lansburgh's the 'opportunity' to become one of the contemplated center's major tenants?"

option was conditioned upon the happening of certain events, concluded:

> The first condition precedent to the Lerner-Gudelsky obligation to Lansburgh's was the securing of necessary zoning for its Tyson's Corner tract. * * * The second * * * was its entering into leases with other major tenants for stores in the center, so the terms of those leases could provide the essential terms of a lease to be offered to [Lansburgh's]. [Appellants] did secure the zoning, and they did, in the latter half of 1965, enter into leases with Woodward & Lothrcp and Hecht department stores * * * [at which time appellants] were under an immediate contractual obligation to tender [Lansburgh's] a lease which in all its material terms would be at least as favorable * * * as the two other leases were to their respective stores. * * * [B]oth the Hecht and Woodward & Lothrop leases * * * contain clauses to the effect that their terms will be at least equal to those offered to other lessees in the center. Thus, even though none of the stores * * * will be identical in design, it is apparent * * * that complete equality of material terms governing occupancy, including amount of space and cost per square

foot, and substantially equal terms on less material aspects of the lease, is within the customary contemplation of parties entering into shopping center agreements of the type at issue in this case.[9]

■■ The appellants here have consistently refused to recognize the distinction between bilateral and unilateral contracts.[10] The trial judge declared inapposite the rule that there is no present legal obligation attached to an *offer* which reserves for future negotiation an element material to the contemplated agreement. We agree. An option is more than an offer, the trier noted; it is itself a contract and is not to be confused with the bilateral contract which it gives the optionee the power to bring into being.[11]

## II

■■ Judge Gasch found that Lansburgh's had exercised its option and was entitled to an order compelling the builders to grant it a lease equal in terms to that of the Hecht lease.[12] The appellants argue that the option-lease agreement is too indefinite and uncertain to be specifically enforced because substantial terms have been left to future negotiation.[13] We approve the trial judge's recognition as a rule of law that

9. 266 F.Supp. at 771. The builders' argument that relief must be barred by laches falls in view of the trial court's findings that (1) at all material times the appellee informed the builders that it intended to hold them to the agreement and (2) the appellee sued as soon as it learned that the final condition precedent, the leases to other stores, had been fulfilled. *Id.* at 779. The included contention that suit should have been brought between the appellants' 1964 attempt to repudiate their obligation and their negotiation of said leases in 1965 is also groundless. Luxenberg v. Mayfair Extension, Inc., 127 U.S.App.D.C. 259, 261–262, 382 F.2d 475, 477–478 (1967).

10. *See generally* 1 S. WILLISTON, LAW OF CONTRACTS § 61A-D (Jaeger ed. 1957).

11. 266 F.Supp. at 772.

12. The appellee submitted a proposed order; the appellants took advantage of

their opportunity to object; the appellee replied; and both parties argued their positions at a hearing during which the appellants were allowed to put on a witness. The final order, filed with a supplemental memorandum on June 13, 1967, in which the District Court retained jurisdiction to insure compliance, directed the appellants to sign the lease which resulted from the above proceedings, and enjoined them from leasing the third store to anyone but Lansburgh's.

13. It might be noted that the appellants' failure to distinguish bilateral from unilateral option-contracts has led them to confuse an indefiniteness which would vitiate the existence of any agreement at all with that indefiniteness which would preclude specific enforcement. *See* 1 A. CORBIN, CONTRACTS § 95, at 400–02, 407–10 (1963).

the mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation between plaintiff and defendant will not bar a decree for specific performance, if in the court's discretion specific performance should be granted.[14]

The rule so stated violates no precedent in this jurisdiction,[15] but rather is in accord with such of our cases as have considered not dissimilar situations.[16]

■ Treating the enforcement of construction contracts as a question novel to the District of Columbia,[17] Judge Gasch emphasized that the essential basis for interposition by the court is the inadequacy or impracticability of the plaintiff's legal remedy rather than the generic subject matter of the contract.[18]

14. 266 F.Supp. at 775. *Accord*, Grubb v. Starkey, 90 Va. 831, 20 S.E. 784 (1894).

15. Although some of the following cases recognized as a general rule the unenforceability of a contract indefinite in its terms, they are all distinguishable. Tucker v. Warfield, 73 App.D.C. 278, 119 F. 2d 12 (1941) (vague and conflicting provisions in personal services, contract not enforced); Crowell v. Gould, 68 App. D.C. 297, 300, 96 F.2d 569, 572 (1938) (internal inconsistency of contract negated agreement on term, not enforced); Hearst Radio, Inc. v. Good, 67 App.D.C. 250, 91 F.2d 555 (1937) (no completed contract to be enforced); Cleborne v. Totten, 61 App.D.C. 69, 57 F.2d 435 (1932) (no lease renewal agreement to be enforced).

16. An option to buy realty for a specified price, under which plaintiff had partly performed, was not rendered unenforceable because it was "on terms to be agreed upon"; the latter meant only that the seller would "in fact agree with plaintiff upon reasonable terms of payment, and would not arbitrarily refuse to proceed with the sale." Morris v. Ballard, 56 App.D.C. 383, 384, 16 F.2d 175, 176, 49 A.L.R. 1461 (1926). In an earlier case, the Supreme Court of the District of Columbia enforced an oral contract to lease a dwelling according to usual terms of similar leases, holding that specific enforcement, "where there is an omission as to the covenants of an agreement for a lease, will be decreed with usual covenants, according to the nature of the lease, and such as are incident to it." Walsh v. Rundlette, 9 D.C. (2 Mac.) 114, 122 (1875).

Moreover, the authorities including the *Restatement*, generally approve or advocate such an approach. *See* 5A A. CORBIN, CONTRACTS § 1174 (1964); RESTATEMENT OF CONTRACTS § 370, comment *d* (1932); and 1 S. WILLISTON, LAW OF CONTRACTS §§ 47, 48 (Jaeger ed. 1957); 5 S. WILLISTON, LAW OF CONTRACTS § 1424 (rev.ed.1937).

17. Despite a paucity of cases in this jurisdiction, we may properly look to the decisions of other courts, recognizing that the "principles and maxims of equity as they existed in England and the colonies in 1776" are part of the law of the District of Columbia by virtue of the Maryland Act of Cession of 1788 and the Organic Act of the District of Columbia, 2 Stat. 103 (1801). *See* D.C.CODE at xvii (1967). The English Chancery long ago enforced a building contract. Holt v. Holt, 2 Vern. 322, 23 Eng.Rep. 808 (Ch. 1694). There the plaintiff's father had "articled" to have a house built on part of his land but died intestate before it was constructed. The court ruled that the son, on whose inheritance the house was to be built, could compel the builder to build it and his father's administratrix to pay for it. The rule so fixed was followed in Allen v. Harding, 2 Eq. Cas.Abr. 17, 22 Eng.Rep. 14 (1701), and recognized in City of London v. Nash, 3 Atk. 512, 515, 29 Eng.Rep. 1095, 1096 (1747). Although the Chancellor would not specifically enforce rebuilding contracts in two cases decided shortly after 1776, Errington v. Aynesly, 2 Bro.Ch. 341, 29 Eng.Rep. 191 (1788); Lucas v. Commerford, 3 Bro.Ch. 166, 29 Eng.Rep. 469 (1790), the conflict was resolved in Mosely v. Virgin, 3 Ves.Jr. 184, 30 Eng. Rep. 959 (1796), in a rule with a remarkably modern ring: "[I]f the transaction and agreement is in its nature defined, perhaps there would not be much difficulty to decree specific performance; but if it is loose and undefined, and it is not expressed distinctly, what the building is, so that the Court could describe it as a subject for the report of the Master, the jurisdiction could not apply." *Compare* Wolverhampton Corp. v. Emmons, [1901] 1 K.B. 515, 525; *see generally* 2 J. STOREY, EQUITY JURISPRUDENCE §§ 1006–10 (14th ed. 1918).

18. 4 J. POMEROY, EQUITY JURISPRUDENCE §§ 1401–03 (5th ed. 1941); RESTATEMENT OF CONTRACTS §§ 358, 361(c), (d) (1932); 5 S. WILLISTON, LAW OF CON-

■ Here it is apparent that Lansburgh's could have had no adequate remedy in damages for any attempt in that respect would have been impractical because of the impossibility of an appropriate measurement. Moreover, damages could hardly compensate for the loss of the sought for opportunity to raise Lansburgh's image and economic position in the Metropolitan Washington area by its anticipated expansion into the suburbs, and for that reason alone could have been deemed inadequate.

■ Thus, where the contractual obligation being enforced involves more than the mere construction of a building and the building is to be built on land controlled by its owner (making it impossible for the enforcing party to have the job done by another and charged to the defaulting owner), specific enforcement becomes entirely appropriate. Nor should relief be withheld merely because it would order construction unless the difficulties of supervision by the court outweigh the importance of enforcement to the plaintiff.[19] In this case, as the District Judge found, the construction criteria set forth in the Hecht and Woodward & Lothrop leases are sufficiently detailed to allow the court, applying the standard of equality required by the option, to enforce the lease contract with little difficulty of supervision.[20] The District Court here has retained jurisdiction and can appoint a special master to settle such details as the parties may not agree upon or which can not be resolved through arbitration.

Affirmed.

TRACTS § 1418 (rev. ed. 1937); *see* 5A A. CORBIN, CONTRACTS §§ 1136, 1141, 1172 (1964); 1 J. STOREY, EQUITY JURISPRUDENCE § 33 (14th ed. 1918).

19. See cases cited 266 F.Supp. at 777 & n. 5, 778. *See* 5A A. CORBIN, CONTRACTS § 1172, at 266–267 (1964); RESTATEMENT OF CONTRACTS § 371, comment *a* (1932); 5 S. WILLISTON, LAW OF CONTRACTS § 1423, at 3979 (rev. ed. 1937). *Compare* Tucker v. Warfield, 73 App.D.C. 278, 280–281, 119 F.2d 12, 14–15 (1941), wherein this approach was recognized but ruled inapplicable to the facts of that case.

20. *See, e.g.,* Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) (patent infringing device had substantially same function to be performed in substantially same way to same result); Barnes v. Sind, 341 F.2d 676, 678–679 (4 Cir.), cert. denied, 382 U.S. 891, 86 S.Ct. 183, 15 L.Ed.2d 149 (1965), rev'g on other grounds 223 F.Supp. 572 (D.Md.1963) (agreement to supply substantially equivalent house);

Phillips Petroleum Co. v. Buster, 241 F.2d 178, 183 (10 Cir.), cert. denied, 355 U.S. 816, 78 S.Ct. 18, 2 L.Ed.2d 33, (1957) (oral agreement to supply gas at reasonable price in quantities reasonably necessary); Armstrong v. Southern Prod. Co., 182 F.2d 238, 241 (5 Cir. 1950) (estimated cost to be agreed upon definite under industry standards); Shoemaker v. American Security & Trust Co., 82 U.S.App.D.C. 270, 273, 163 F.2d 585, 588 (1947) (equitable approximation enforcing testamentary trust by selling unsuitable and buying suitable land); In re Standard Gas & Elect. Co., 151 F.2d 326, 333 & n. 12 (3 Cir. 1945), cert. denied, Guaranty Trust Co. of New York v. Securities and Exchange Comm., 327 U.S. 796, 66 S.Ct. 820, 90 L.Ed. 1022 (1946), rev'g on other grounds, 59 F.Supp. 274, 279 (D.Del.1945) ("equitable equivalent" of right security holder surrendered in reorganization of solvent corporation); Moon Motor Car Co. v. Moon Motor Car Co., 29 F.2d 3 (2 Cir. 1928) (standard existed at time of performance).