Arthur G. HACKNEY et al., Appellants,

v.

MORELITE CONSTRUCTION, D. C. Corp., Appellee.

No. 79–904.

District of Columbia Court of Appeals.

Argued April 2, 1980.

Decided Aug. 19, 1980.

---

Jacob Sheeskin, Rockville, Md., for appellants.

Benny L. Kass, Washington, D. C., for appellee.

Before NEWMAN, Chief Judge, and KELLY and MACK, Associate Judges.

KELLY, Associate Judge.

After a bench trial on stipulated facts, the trial court ruled that a letter of intent regarding certain realty owned by appellee Morelite Construction was not an enforce-able option contract. Arthur G. Hackney and Sandra A. Conley, the would–be purchasers, appeal that ruling. Concluding that the statute of frauds and parol evidence objections were waived by appellee's stipulations at trial, we hold that the trial court's limited inquiry–into the enforceability of the written document only–was erroneous and that there was a valid option contract here; consequently, we reverse its ruling.

We set forth the pertinent facts, as stipulated to at trial by both parties:

[COUNSEL FOR APPELLANTS]: The defendant Morelite Construction, a D. C. Corporation, . . . with its main headquarters in New York . . purchased certain real property in the District of Columbia under a contract with the District of Columbia Government, under the condition that the property was to be renovated and sold for a base price approved by the Housing and Urban Development, plus additional extras to be approved by RLA, Redevelopment Land Agency of the District of Columbia.

\* \* \* \* \* \*

The piece of property involved in this case is at 402 Tennessee Avenue, Northeast. The price on that property was set in June, 1978, at $60,000. Certain extras were approved and an original contract signed between the defendants and the Redevelopment Land Agency of the District of Columbia.

I have a letter from the District of Columbia, sent to the defendant corporation, which approves all the prices for the extras.

\* \* \* \* \* \*

The letter speaks for itself.

The plaintiffs first saw this property . . . through a real estate agency known as Metro Properties, who put them in touch with a Mr. Phipps of the defendant corporation.

\* \* \* \* \* \*

At the time the plaintiffs met Mr. Phipps, he identified himself as a vice-president of Morelite Construction . . . .

The president of that corporation later testified at a deposition that Mr. Phipps was vice-president of that corporation from the time of its organization until his death on August 3, 1977.

The plaintiffs actually met with Mr. Phipps in the office of the defendant corporation on June 21, 1977. They told him that they were interested in the property . . . and . . . asked him what must we do to get that house? Mr. Phipps replied, give me a letter of intent with a deposit. This will guarantee that you will get the first option to buy this house when it was ready.

A letter of intent was prepared on that date, June 21, 1977, in the office of the Metro Properties, the real estate agent. It was signed by the plaintiffs and by Allen Phipps as vice-president. Now, it is signed, Allen Phipps, vice-president, but it does not say Morelite Construction, D. C. corporation.

Mr. Hackney, one of the plaintiffs, gave . . . the real estate agent, a check for $1,000 as suggested by Phipps. The check was deposited into Metro Properties' escrow account, and it is still being held in that account by the realtor.

Mr. Weintraub [phonetic], the president of the defendant corporation learned about the letter of intent from Mr. Phipps approximately one month after it was signed. Weintraub, somewhere along about May or June of 1978 spoke to one of the plaintiffs, Mr. Hackney.

\* \* \* \* \* \*

· He . . . told Mr. Hackney that as far as he was concerned Hackney had nothing on the property in question and that Weintraub had employed no real estate firm to sell the property. He also told Hackney Metro Properties had no right to take Hackney's money. He suggested to Mr. Hackney to get his money back form Metro Properties.

Prior to signing this letter of intent, Mr. Hackney had had a conversation with Mr. Phipps, the vice-president, who told him that the house was being purchased from the District of Columbia Government and that the defendant corporation was restricted in profits, and that the house could only be sold for a price approved by Governmental agencies.

Phipps also stated that the price would probably be . . . in the $60,000 range.

Mr. Hackney told Phipps he would be willing to pay the price approved by the Government. And on this understanding, he signed a letter of intent.

On January 30, 1978, Metro Properties . . . addressed a letter to Mr. Weintraub, referring to the letter of intent and asking Mr. Weintraub to contact Metro Properties for the purpose of completing their transaction.

Weintraub replied on February 8, 1978, and stated that the letter of intent signed by the deceased, Allen Phipps, was not binding, since there was no way to know on June 21, 1977, the selling price of the property. Weintraub also stated that he did not know the selling price.

In the early part of June, 1978, the plaintiffs found out that the price of the property had been set by the Governmental agencies at $60,000. At that time they prepared and presented a paper to purchase the property at $60,000. They presented it to the defendant. The defendant did not accept the paper, did not sign it, wouldn't take the physical possession of the paper.

After signing the letter of intent and depositing the $1,000 in June of '77, the other plaintiff, Sandara Conley, went through the house on two different occasions with Mr. Phipps. After going through the house, the second time, she drew up some rough plans, showing Mr. Phipps the way she would like to have the house remodeled and gave the plans to Mr. Phipps.

The disputed letter, written under the real estate agent's letterhead, states:

June 21, 1977

This letter of intent and good faith deposit of One thousand dollars ($1,000.00) is submitted to show our serious intent to purchase the property at 402 Tennessee Ave N.E., Washington, D.C. We wish to assist in the design for the renovation of the property and participate in the selection of finishing cosmetic items.

The deposit is to be held by Metro Properties. In the event that a contract agreement for the sale of 402 Tennessee Ave NE between the purchasers and seller has not been written within forty–five (45) days, the purchasers reserve the right to withdraw this letter of intent and have their deposit refunded in full.

Agent /s/ Thomas R. Feathering
Purchaser /s/ Arthur G. Hackney
Purchaser /s/ Sandra A. Conley
Seller /s/ Allen Phipps, vice pres.

There are only two issues here: (1) whether appellee made an oral promise to appellants, in exchange for valuable consideration, to keep a realty sales offer open for a fixed or reasonable period of time (that is, whether the parties made a valid oral option agreement) and (2) if so, whether enforcement of that oral agreement is barred by the District of Columbia Statute of Frauds, D.C. Code 1973, § 28–3502. We answer the first question affirmatively and conclude that appellee's stipulations at trial estop it from asserting either a Statute of Frauds bar or a parol evidence objection [1] to the enforcement of the oral agreement.

### Statute of Frauds

We address the statute of frauds issue first.[2]

■ The statute of frauds, first enacted in England in 1677, 29 Car. II, Cap. 3, was "intended to guard against the perils of

---

1. The relationship between the parol evidence rule and the statute of frauds frequently has been made more intimate than either rule requires. The former bars the admission of prior written or prior or contemporaneous oral evidence that adds to or is inconsistent with the terms of a written document that constitutes a complete and final (integrated) statement of the parties' agreement. The latter bars enforcement of certain oral agreements unless there is a written memorandum signed by the party to be charged. The two doctrines are frequently, as here, applied concurrently and interchangeably with the result that, even if the memorandum satisfies the statute of frauds, the oral agreement will not be enforced on the grounds that it is not complete and integrated. This result is at odds with the purpose of the statute, which does *not* require an exhaustive, integrated statement of the agreement in writing, but only a sufficient statement to establish that there in fact *was* an agreement and that the party charged should be bound by it. *See* 1 Restatement of Contracts § 207 (1932) (parties, terms, and subject of oral contract need only be stated "with reasonable certainty" in the memorandum). Calamari and Perillo, Contracts § 19–27 at 714–15 (2d ed. 1977) states that this outcome (that the party sought to be charged may obtain dismissal under the Statute of Frauds merely because the written memorandum is not integrated) is "one of the more bizarre results of the often criticized Statute of Frauds."

The chain leading to such an illogical outcome is simply broken–by allowing parol evidence to come in, regardless of the statute of frauds, whenever, as is usually the case, the

memorandum was not intended to be integrated; this does no violence to either rule. *See Jay's Restaurant, Inc. v. Jack Stone Co., Inc.,* D.C.Mun.App., 62 A.2d 799, 800 (1948) (parol evidence is admissible when "it may properly be inferred that the parties did not intend the writing to be a complete and final statement of the whole of the transaction between them") (quoting *Mitchell v. David,* D.C.Mun.App., 51 A.2d 375 (1947)). Parol evidence has, in fact, frequently, if not expressly, been allowed to come in, both to explain ambiguous terms and to provide missing essential terms of the written memorandum. *See, e.g., Ochs v. Weil,* 79 U.S.App.D.C. 84, 142 F.2d 758 (1944) (in purchase and sale agreement which was not signed by party to be charged (owner) held: owner's name could be provided from prior telegram between owner and broker); *Brewood v. Cook,* 92 U.S.App.D.C. 386, 207 F.2d 439 (1953) (oral agreement to sell land held not to be excluded by parol evidence rule when found to be inducement to sign valid written agreement).

2. The District of Columbia Statute of Frauds, D.C.Code 1973, § 28–3502 states, in pertinent part:

An action may not be brought to charge . . . a person upon an agreement made . . . upon a contract or sale of real estate, [or] of any interest in or concerning it, . . . unless the agreement . . . or a memorandum or note thereof, is in writing, which need not state the consideration and signed by the party charged therewith or a person authorized by him.

perjury and error in the spoken word, and to protect defendants against unfounded and fraudulent claims." 3 Williston on Contracts § 448 at 344 (3d ed. 1960). The statute's intent was not to invalidate any oral agreement in one of the enumerated classes, but merely to suspend its enforcement "until the statute is satisfied by the reduction of it to writing." *Id.* at 342.

The statute was devised, not as a mandatory directive to reduce to writing any oral contract which comes under the statute on pain of forever foregoing the right to enforce it, but, rather, as an optional defense that the party being charged may invoke to prevent the enforcement of unfounded claims against him. Consequently, the defense may be lost if it is not affirmatively pleaded. *Cavalier v. Weinstein*, D.C.Mun.App., 80 A.2d 918 (1951); *Saunders System Washington Co. v. Kuffner*, D.C.Mun.App., 75 A.2d 136 (1950); Super.Ct.Civ.R. 8(c).

There are several situations where courts may refuse to allow the defendant to interpose a statute of frauds defense even if it is properly raised: "[I]n the early history of the statute a defendant was denied the privilege of pleading [it] in three main instances: (a) where his own fraud was responsible for the non-existence of the required signed memorandum [equitable estoppel]; (b) where the equitable doctrine of part performance was applicable [promissory estoppel], and (c) where the defendant has admitted the contract [waiver]." *Wolf v. Crosby*, 377 A.2d 22, 26 (Del.Ch.1977).

The courts in this jurisdiction have had numerous occasions to deny defendants a statute of frauds defense under the first two of these three circumstances (equitable and promissory estoppel). *See, e. g., Ammerman v. City Stores Co.*, 129 U.S.App. D.C. 325, 394 F.2d 950 (1968) (promissory estoppel; plaintiff's justifiable reliance on an agent's promise estops latter from asserting statutory bar); *Amberger & Wohlfarth, Inc. v. District of Columbia*, D.C. App., 300 A.2d 460 (1973) (partial or complete performance under an oral contract

may remove the case from the applicability of the statute); *Easter v. Kass-Berger, Inc.*, D.C.Mun.App., 121 A.2d 868 (1956) (doctrine of fraud may be invoked to prevent statute of frauds from becoming an instrument of fraud); *Kresge v. Crowley*, 47 App.D.C. 13 (1917) (statute of frauds will not be applied by equity court when to do so would make statute an instrument of fraud).

However, we have not yet had occasion to consider whether a defendant waives his right to assert the defense of the statute by stipulating sufficient facts to establish that an agreement was, in fact, reached. Our sister court in Maryland, however, in deciding a case involving this very question (where it was required to apply our law under conflict of laws principles), "assume[d] that [we would] follow Maryland law in [such an instance]," *Friedman v. Clark*, 252 Md. 26, 30, 248 A.2d 867, 871 (1969); it then found that a defendant's in-court admission that he made the disputed promise constitute a waiver of the statutory defense, on the grounds stated in an earlier case, *Trossbach v. Trossbach*, 185 Md. 47, 42 A.2d 905 (1945):

> Under existing procedure, the purpose of the Statute of Frauds is to protect a party, not from temptation to commit perjury but from perjured evidence against him. The purpose of evidence is to prove facts. Admissions of a party in testifying, though in form evidence, are in essence not mere evidence, but make evidence against him unnecessary. . .
>
> Furthermore, admissions of a party in the form of testimony would constitute sufficient 'memoranda' . . . under . . . the [Maryland] statute. For this purpose we think recorded testimony should be regarded as equivalent to signed depositions. [*Id.* at 50, 42 A.2d at 908.]

We share the concern, expressed in a more recent Maryland case, that a defendant

> can admit an honest obligation and yet defeat its enforcement by pleading that the agreement was only oral and that

there is no written evidence of the obligation as required by the Statute of Frauds.
. . . [*Wolf v. Crosby, supra* at 25 (quoting Stevens, *Ethics and Statute of Frauds,* 37 Cornell L.Q. 355, 367 (1952).]

We are persuaded that this result would be inconsistent with the purpose of the statute. *See* 2 Corbin on Contracts, §§ 293, 319–20, 498 (1950), as is recognized in the statute of frauds provision in the Uniform Commercial Code (codified in the District of Columbia at D.C. Code 1973, § 28:2–201), which states, in pertinent part:

> (3) A contract which does not satisfy the requirements of subsection (1) [a writing, signed by the party against whom enforcement is sought, "sufficient to indicate that a contract . . . has been made between the parties"] but which is valid in other respects is enforceable:

> \*   \*   \*   \*   \*   \*

> (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made

> .   .   . .

Seeing no reason to depart from the principles stated in the Uniform Commercial Code, or in the Maryland cases cited, and finding no meaningful difference between an admission in court and the trial stipulations entered into by the parties here, we hold that the appellee in this case is barred from asserting the statute of frauds as a defense if the facts its counsel stipulated to on its behalf at trial show that it in fact orally agreed to the contract sought to be enforced against it.

### Oral Option Contract

■ Having concluded that appellee's statute of frauds defense may be waived if the stipulated facts establish that appellee orally promised to keep open a sales offer of the disputed property, we must proceed to evaluate the sufficiency of those facts, without being confined either to the four corners of the written memorandum (as was the trial court), or by its denomination as a "letter of intent." [3]

The stipulated facts, *see* text *supra,* show that Mr. Phipps, the vice president of appellee Morelite Construction, when appellants asked what they "must do to get that house," replied, "give me a letter of intent with a deposit. This will guarantee that you will get the first option to buy this house when it [is] ready." He also told appellants (before they signed the letter) that "the house [can] only be sold for a price approved by Governmental agencies . . . probably in the $60,000 range." Appellant Hackney then "told Phipps he would be willing to pay the price approved by the government.[4] *And on this understanding he signed a letter of intent.*" (Emphasis added.) Appellee's vice president also signed the letter and appellants deposited $1,000 into an escrow account; appellant Conley went through the house twice and drew up remodeling plans, which she gave to Mr. Phipps.

We conclude that the foregoing facts, together with the letter of intent, provide ample evidence (1) that appellee, by its agent,[5] made a promise to keep open an offer to sell the disputed property "for a fixed or reasonable period of time" (at least until the house was "ready" and its price approved by the governmental agencies);

---

3. As Professor Corbin instructs: "No words or phrases, in any language, have an 'objective' meaning . . . with which men are required to use them at their peril. This is as true of 'option' as it is of 'chicken.' So also of 'Refusal,' 'Right to Buy,' 'Privilege to Purchase.'" 1 A Corbin on Contracts § 261A (1963) (footnote omitted).

4. The price eventually set by the government agency was concededly the one predicted by Mr. Phipps—$60,000.

5. Appellee does not argue on appeal that Mr. Phipps was not its agent in this transaction. We also note that it was stipulated that Mr. Weintraub, its president, knew of Mr. Phipps' actions within at least a month and yet never repudiated them on the grounds that Mr. Phipps lacked authority to bind appellee. (His attempted repudiation of the option a year after the letter was signed was on the grounds that the price was too indefinite.)

(2) that the promise was "given for valuable consideration" ($1,000), constructively delivered to appellee; and (3) that both the property and the term of the option offered were described in sufficient particularity (the price was to be set by the appropriate agencies; the identity and location of the property were clear and never have been disputed.) The presence of these three factors, under the definition set forth in *Ammerman v. City Stores Co., supra*, at 328, 394 F.2d at 953, amply establishes the elements of a valid option contract. *See* 1 Restatement of Contracts, *supra* § 46.

We are unpersuaded by appellee's principal contention—that because there was no agreement between the parties as to certain incidental factors, such as which side is to bear various closing costs and transfer taxes—there was no meeting of the minds as to the price, an essential term of the contract.[6]

Although the exact base price was not agreed upon in writing (as it could not have been, given the agencies' future roles in determining it), the stipulations reveal that an ascertainable standard for setting the base price was orally agreed upon—that is, the very price set by the agencies with adjustments for "extras" also to be determined by the appropriate agency.

The agreed upon standard in this case is, therefore, at least as precise as the one enforced in *Morris v. Ballard*, 56 App.D.C. 383, 384, 16 F.2d 175, 176 (1926), where "on terms to be agreed upon" was held to be sufficiently specific and the agreement was construed to mean that the seller would "in fact agree with plaintiff upon reasonable terms . . . and . . . not arbitrarily refuse to proceed with the sale." The standard here is comparable to the one held not "too indefinite and uncertain" to be specifically enforced in *Ammerman v. City Stores Co., supra* at 330, 394 F.2d at 953 ("rental and terms at least equal to that of any other major department store in the center.") *See* 4 Corbin on Contracts § 574 at 70–72: price must be "certain or so referred to a definite standard that it may be made certain. Not only may evidence of usage or of the meaning of trade terms be shown to make definite the terms of a memorandum, but if the agreement in fact did not include a fixed price, none need be mentioned in the memorandum. The law will imply an obligation to pay a reasonable price." *See generally* 2 A.L.R.3d 703 (1965): "Option agreements have generally been held or recognized to be sufficiently definite as to price to justify their enforcement if either a specific price is provided for in the agreement *or a practicable mode* is provided by which the price can be determined by the court without any new expression by the parties themselves."

As the court in *Ammerman v. City Stores Co., supra* at 330, 394 F.2d at 955, states, in a passage quoted in appellee's brief:

> [T]he mere fact that a contract, *definite in material respects*, contains some terms

---

6. Appellee's heavy reliance on *D.C. Area Community Council, Inc. v. Jackson*, D.C.App., 385 A.2d 185 (1978), for its argument that there was no meeting of the minds in this case is misplaced. The disputed promise in that case was, at most, an offer, and not a unilateral option contract, because it was not given in exchange for either consideration, as here, or justifiable reliance, as in *Ammerman, supra*. *See D.C. Area Community Council, Inc. v. Jackson, supra* at 188 n.1 (justifiable reliance is considered to be a modern substitute for consideration in contract law); 1 Williston on Contracts § 100 at 369 (3d ed. 1960); 1 Restatement of Contracts, *supra* § 90. *See also Brewood v. Cook, supra.*

Nor was the disputed promise in *D.C. Area Community Council, Inc. v. Jackson, supra*, a bilateral option agreement or a bilateral purchase and sale agreement, because it was not given in exchange for a binding return promise (because there was thus no mutuality of obligation, no contract was ever formed). Appellant in *D.C. Area Community Council* merely promised to "contract to buy the subject property *if it* [the appellant] were financially able to assume [a] . . . mortgage . . . [and *if*] *appellants* [was able] to reach an agreement with Pepco with respect to the existing utility obligations." *Id.* at 186 (emphasis added). Therefore, as the trial court there had observed, there was no mutuality: "if the sellers [appellees] had gone to court . . . to enforce the [appellant] . . . to go through with the sale, the [appellant] simply could not have done so, nor . . . would [it] have assented to the idea that [there] was a contract which bound them to perform."

 

which are subject to further negotiation . . . will not bar a decree for specific performance. [Emphasis provided by appellee.]

We conclude that there was sufficient evidence in the facts stipulated at trial to find that appellee, by its agent, orally promised to keep open an offer to sell this realty to appellants until such time as the appropriate governmental agencies set the property's price and at the base price set by the agencies. We also hold that appellee's stipulations at trial were comparable to a written admission and constituted a waiver of its statute of frauds defense to this action and of any parol evidence objections to the admission of the stipulated facts.

*Reversed and remanded for further proceedings consistent with this opinion.*