**RAINBOW NAVIGATION, INC., et al., Plaintiffs,**

v.

**DEPARTMENT OF the NAVY, et al., Defendants.**

**Civ. A. No. 88–0992 (HHG).**

United States District Court,
District of Columbia.

Nov. 15, 1988.

Karen Hastie Williams, Clifton S. Elgarten, Stuart H. Newberger, Crowell & Moring, Washington, D.C., for plaintiff Rainbow Navigation, Inc.

Jeffrey Hunter Moon, Asst. U.S. Atty., Washington, D.C., for defendants; Richard Haynes, Dan Wentzell, Military Sealift Command, of counsel.

Benjamin L. Zelenko, Martin Shulman, Landis, Cohen, Rauh & Zelenko, Washington, D.C., for intervenors Intern. Organization of Masters, Mates and Pilots.

Joanne W. Young, David E. Short, Michael G. Roberts, Lord, Day & Lord, Barrett Smith, Washington, D.C., for Iceland S.S. Co., Ltd. "EIMSKIP".

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This case, which involves shipping between the United States and Iceland, is now before this Court for the fourth time in three years. On the first three occasions, the Court concluded that the government's legal position was erroneous, its factual statements at odds with the facts, or both. As discussed below, with every negative ruling, the government devised yet new and different means for eliminating the plaintiff from the United States–Iceland trade. The Court now holds that the Executive's latest action has no more validity than its three previous efforts.

### I

Plaintiff, Rainbow Navigation, Inc., is a United States shipping company which prior to the events described herein had carved out for itself a small niche in the military cargo trade between this country and Iceland. Rainbow's entry into this trade pierced what had until then been a monopoly of Icelandic shippers:[1] its vessel "Rainbow Hope," was the only non-Icelandic ship to participate in this trade, as no other American shippers had found it profitable to do so. The Republic of Iceland, a NATO ally of the United States, made urgent representations to the Department of State to bar Rainbow in an attempt to recapture the monopoly its vessels had previously enjoyed.

In response to these pressures, the Secretary of the Navy made a finding in August 1985 that Rainbow's rates were "excessive and otherwise unreasonable"—the only basis upon which that American company could lawfully be deprived of the right established by the Cargo Preference Act of 1904[2] to carry American military

---

[1.] For nearly twenty years, no United States-flag vessel operated between this country and Iceland. *Rainbow Navigation, Inc. v. Department of the Navy,* 783 F.2d 1072, 1074 (D.C.Cir.1986).

[2.] 10 U.S.C. § 2631.

cargo. The Secretary's finding of excessive pricing turned out, upon examination, to be fictitious and pretextual. Inquiry revealed, and the Court found, that the Navy's determination adverse to Rainbow was based not on freight rates—which were no higher than those that had previously been charged[3]—but on foreign policy, political, or geopolitical grounds. *Rainbow Navigation, Inc. v. Department of the Navy*, 620 F.Supp. 534, 540 (D.D.C.1985) (*Rainbow I*). The Court of Appeals, in an opinion authored by then Judge Scalia, affirmed. *Rainbow Navigation, Inc. v. Department of the Navy*, 783 F.2d 1072 (D.C. Cir.1986).

Next, the Navy attempted another and different end run around the Cargo Preference Act. Under government regulations, military aircraft may be used under certain narrow circumstances in lieu of private commercial vessels to carry military cargo, and such aircraft now began to take over the Iceland–United States military cargo traffic, squeezing out Rainbow.[4] However, the regulations contain a presumption in favor of commercial carriage, and they stipulate that military aircraft may displace commercial carriers only if the aircraft "are available and not fully utilized." 48 C.F.R. § 47.101(b)(1).

Once again, the legally necessary findings were promptly made. The Navy duly concluded, on the basis of sworn statements from officials,[5] that aircraft were not being flown to Iceland for the purpose of picking up military cargo; that, on the contrary, such aircraft were "available and not fully utilized;" and that therefore Rainbow's services could largely be dispensed with. Once again, the Secretary's determination and the sworn statements of his military and civilian subordinates were false.

In fact, the number of military flights from Iceland to this country had sharply increased concurrently with the diversion of this cargo from Rainbow, and the Court found that the aircraft to carry the cargo had not been "available" but had been dispatched to Iceland for the specific purpose of carrying the freight in question. The Court held that the Navy had once again attempted unlawfully to deprive Rainbow its rights under the law. Memorandum Order dated October 17, 1986 (*Rainbow II*).

That is where the matter stood when, on September 24, 1986, the United States and Iceland signed a treaty[6] regarding the military cargo in the United States–Iceland trade.[7] The treaty provides for a competition between the shipping companies of the two nations for that cargo. Following that competition, contract awards are to be made to one Icelandic company and one American company, the lowest bidder to receive for carriage sixty-five percent of the cargo, the next lowest bidder, which must be of the other country, to carry the remainder. A competition was conducted in 1987 according to these terms, without difficulty or complaint.

However, the Navy thereafter announced plans to change the method by which the competition was to be held the

---

**3.** Indeed, the American military had never prior to the Icelandic government's lobbying effort complained about Rainbow's rates; the only complaint was that of Icelandic shippers which charged that the rates were too low. The 1985 finding of excessive pricing was the first one made in the 81–year history of the Act.

**4.** It obviously was the expectation of the officials in all this that once Rainbow was eliminated, the status quo ante would return, and the Icelandic shippers would regain their monopoly, curing one of the State Department's headaches.

**5.** *See* Declarations of Edward Coyle, Deputy Director, Transportation Operations and Policy, Naval Supply Systems Command, Department

of Navy, May 30, 1986 and May 9, 1986, and declaration of Tech. Sgt. Patrick Jurgensmeyer, June 19, 1986.

**6.** Treaty Between the United States of America and the Republic of Iceland to Facilitate Their Defense Relationship, September 24, 1986, United States–Iceland T.I.A.S. No. —— (May 5, 1987).

**7.** The treaty included a Memorandum of Understanding (MOU). There is for purposes of this litigation no material difference between the two, and they will hereinafter be collectively referred to as the "treaty."

following year, to Rainbow's detriment.[8] The Court once again enjoined the government's attempt to force Rainbow out of business, upon its conclusion that the method devised by the Navy following the 1987 competition violated the Icelandic treaty. *Rainbow Navigation, Inc. v. Department of the Navy*, 686 F.Supp. 354 (D.D.C.1988) (*Rainbow III*).[9] That is where the matter stood when the most recent set of motions was filed.[10]

## II

■ As indicated above, in 1987, following ratification of the treaty with Iceland, the Navy's Military Sealift Command held a competition that caused no controversy. However, in February 1988, the Sealift Command issued a different Request for Proposals (RFP) regarding the next Iceland cargo contract. Following the Court's decision in *Rainbow III*, the government recognized that this RFP did not conform the treaty as the Court had construed it, and it proposed to the Court yet another RFP which, while conforming to *Rainbow III*,[11] includes a number of new provisions and conditions and eliminates some others.[12]

Rainbow, supported by the International Organization of Masters, Mates and Pilots (maritime union), intervenor herein,[13] is challenging this new RFP, arguing that, in its eagerness to eliminate Rainbow, the government has once again overstepped the bounds of law, treaty, and prior undertaking. The Court agrees.

In order to understand the current phase of the dispute between the parties, it is necessary to discuss the proceedings in the United States Senate in connection with the ratification of the Icelandic treaty.[14]

■ The first question to be considered in that connection is a legal one—what is the effect of representations made by the Executive Branch to the Senate? Although when this litigation was before the Court last Spring the government took the position that the representations made in connection with the treaty ratification proceedings were merely "precatory" and "non-binding," *Rainbow III, supra,* 686 F.Supp. at 357 n. 17, this apparently is no longer the government's view. The Court rejected that position,[15] and the govern-

---

**8.** Among other changes discussed below, the Navy proposed to replace the 1987 model single competition with two separate competitions, one for sixty-five percent of the cargo, the other for thirty-five percent. The reasons why this method of proceeding violates the treaty to the disadvantage of Rainbow are detailed in the *Rainbow III* Opinion, *infra.*

**9.** Additionally, as soon as Rainbow sought relief from the government's unlawful actions, the Navy filed an administrative protest against Rainbow with the Small Business Administration, challenging the company's previously settled *status as a small business.* That patently retaliatory action, too, proved to be unsuccessful, as the SBA rejected the protest. Letter of May 25, 1988, Thomas Dumarosq, Acting Regional Administrator for Procurement Assistance, SBA, attached to "Notice of Withdrawal of Motion to Enjoin the Navy from Pursuing Its Collateral Small Business Protest."

**10.** The May 17, 1988 order was in the form of a preliminary injunction. The parties are now before the Court on Rainbow's request for permanent relief and on the government's motion to dismiss and for partial summary judgment.

**11.** Nevertheless, the government appears to be still contending that the treaty does not require a single competition as the Court had concluded

in *Rainbow III.* Defendants' Reply Brief at 5 n. 6.

**12.** Citing its apparent acquiescence in *Rainbow III* (*but see* note 11, *supra*), the government has moved for partial summary judgment on the ground of mootness. The motion lacks merit, not only because the basic controversy between the parties regarding Navy compliance with the treaty is very much alive, but also because, in view of the past history of this case, the Court affirmatively concludes that, absent an injunction, the Navy is likely to repeat its unlawful conduct. *See Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973); *British Caledonian Airways, Ltd. v. Bond*, 665 F.2d 1153, 1157–58 (D.C.Cir.1981).

**13.** The crew of the "Rainbow Hope" is composed entirely of American seamen.

**14.** The text of the treaty itself insofar as it bears on this lawsuit is fully discussed in *Rainbow III.*

**15.** The same position has also been rejected by eminent authorities in other contexts. *See* The ABM Treaty Interpretation Resolution, Report of the Committee on Foreign Relations, United States Senate, S.Rep. No. 164 (100th Cong., 1st Sess. 49 (citing testimony of Prof. Henkin) (1987). *See also,* Restatement (Second) Foreign

ment now appears to disavow it,[16] stating that

> ... authoritative Executive branch representations concerning the meaning of a Treaty which form part of the basis upon which the Senate gives advice and consent are entitled to be accorded binding weight as a matter of domestic constitutional law, and the Executive branch fully accepts that it is bound by such statements....

Defendants' Reply Brief and Opposition to Plaintiff's Cross–Motion for Summary Judgment at 2 n. 2.

This Court has no doubt about the obligation of the Executive Branch to stand behind the representations made by its officials to the Senate committee having jurisdiction, and to comply with the conditions attached, formally or informally, by the Senate as part of its ratification.[17] Any other rule would undermine the authority of the Senate under Article 2 section 2 of the Constitution to concur or to fail to concur in treaties made by the Chief Executive. If, following ratification, the Executive could unilaterally change the meaning of a treaty as it had been presented to the Senate, the careful consideration the Senate gives to treaty language, purposes, and effect, would stand in constant peril of nullification by reinterpretation by Executive officials, high or low.[18]

It is appropriate, then, to consider exactly what representations were made by the Executive Branch witnesses regarding the meaning and effect of the Iceland treaty, and what conditions or understandings were arrived at as part of the ratification process.

The principal Executive Branch witnesses who testified before the Senate Committee on Foreign Relations on the Icelandic treaty were the Hon. Edward J. Derwinski, Counselor of the Department of State, and Rear Admiral Walter T. Piotti, Jr., Commander of the Navy's Military Sealift Command.[19] Senator Mathias asked the witnesses about the "current American flag carrier," *i.e.*, Rainbow,[20] and whether any plans were in effect to "save harmless the

---

Relations Law of the United States (Revised), Tentative Draft No. 6 (1985), § 314 (comment d and § 314(2); and *see also*, 134 Cong.Rec. S6774–75 (daily ed. May 26, 1988) (statement of Sen. Nunn) (government's position in *Rainbow* that treaty testimony is nonbinding "undermined not only the Senate as an institution but the whole treaty ratification process as set forth in the U.S. Constitution").

**16.** However, on this issue as on the issue of the requirement of a single competition (*see* notes 11 and 12, *supra*), the government's position is still either shifting or equivocal. Thus, the government has observed that Executive statements should be given binding weight only when they were "authoritatively and explicitly communicated to the Senate by the Executive and were part of the basis on which the Senate granted its consent...." Further, referring to Mr. Derwinski's "save harmless" statement (*see* p. 343, *infra*), the government asserts that his statement "imposes *no* binding obligations on the government" (emphasis added). Defendants' Reply Brief to Intervenor Eimskip's Response at 2 n. 1. These assertions appear to be crafted to construct yet another avenue of retreat from commitments made to the Senate.

As indicated below, Counselor Derwinski and Admiral Piotti represented the Executive Branch before the Senate Committee on Foreign Relations. It would be seriously misleading to the Senate and disruptive of the constitutional ratification process if it were to be accepted that some representations made to that legislative body by witnesses such as these were deemed authoritative but not others, depending upon a subsequent decision of members of the Executive Branch.

**17.** As indicated below, the Senate Committee on Foreign Relations recommended advice and consent to the Icelandic treaty only on the basis of the Executive assurances made regarding Rainbow.

**18.** The Senate Committee on Foreign Relations has stated in connection with the debate over the ABM treaty, the Executive's unilateral reinterpretation of treaties "assaults the Constitution's allocation of the treaty power," "disparages the Constitution's requirement that the President take care that the laws be faithfully executed" and "denigrates the central precept of international order—the principle that treaty obligations are to be carried out in good faith." Senate Committee on Foreign Relations, The ABM Treaty Interpretation Resolution, S.Rep. No. 164, 100th Cong., 1st Sess. 47 (1987).

**19.** Admiral Piotti had the responsibility for implementing the treaty on behalf of the Navy.

**20.** Rainbow was, is, and for several years has been the only American flag carrier operating in the Icelandic trade.

current cargo carrier." Mr. Derwinski replied to this query with two assurances: (1) that carrier has been involved in a number of discussions with appropriate authorities, and (2) although the Department obviously could not provide in the treaty for specific protection for an entity, "we did have in mind at all time the need to *protect the interests of the current carrier*" (emphasis added).[21]

While this language suggests that Rainbow had been a party to discussions regarding the appropriate way of implementing the treaty (and by inference that there was agreement with the plans made with respect thereto), and that the Department was mindful of the need "to protect the interests" of Rainbow and to "save [it] harmless," these assurances were apparently not deemed to be sufficiently airtight by Rainbow and those who were supporting its cause.[22]

Accordingly, language was included in the Senate Report which recommended ratification of the treaty to make more explicit the requirement that Rainbow was to be protected, as follows:

> [T]he committee recommends that the Senate advise and consent only with the assurances of the Departments of State and Defense that ... the treaty will be implemented in such a way that the existing United States-flag service in the Iceland trade would not be disadvantaged as a result of the treaty. The Committee received those assurances at its hearing, and recommends advice and consent on that basis only.
>
> The Committee understands and expects that the economic viability of the United States-flag service will be maintained as

if the 1904 Act were fully in effect in the Iceland trade.

S.Rep. No. 27, 99th Cong., 2d Sess. 2 (1986). at 3.[23]

This was not a unilateral Senate declaration; Mr. Derwinski, the principal Administration witness, testified: "*I have seen the language which is proposed for your committee report, yes, sir. And I have absolutely no objections to it.*"[24]

■ The Court concludes that, insofar as the United States government is concerned, the treaty includes two undertakings: first, that the existing United States-flag service in the Iceland trade would not be disadvantaged as a result of the treaty; and second, that the economic viability of that service will be maintained just as if the 1904 Act were fully in effect. The issue before the Court is whether the method chosen by the Navy in the proposed RFP for implementing the treaty is consistent with these undertakings.

### III

Plaintiff asserts that the Navy through its Military Sealift Command, which has operational responsibility with respect to the Icelandic trade, has violated these governmental undertakings in several respects. In Part IV, *infra,* the Court examines these complaints and the specific Navy measures to which they relate. Two fundamental points bear noting at the outset, however.

First. The provisions in the RFP that the Sealift Command now deems essential had never been a part of any procurement with respect to the Icelandic trade, and they were not a part thereof even as late as

---

21. United States–Icelandic Treaty on the Carriage of Military Cargo: Hearings Before the Committee on Foreign Relations, 99th Cong., 2d Sess. (1986) at 11.

22. The maritime unions, in particular, lobbied to retain in being this particular source of jobs for American seamen. *See* Letter from Maritime Unions to Sen. Richard G. Lugar, Chairman of the Committee on Foreign Relations (Sept. 30, 1986); *see also,* Opposition of Inter-

venor International Organization of Masters, Mates and Pilots to Defendant's Motion to Dismiss in Part and for Summary Judgment at 2–3.

23. Senator Pell reiterated during the floor debate that the Executive had "assured the Committee that the Treaty will be implemented in such a way that the existing Icelandic trade would not be disadvantaged." 132 Cong.Rec. S15661 (daily ed. October 8, 1986).

24. Hearings at 11–12.

1987.[25] These provisions acquired critical importance to the Sealift Command only when the Court in *Rainbow III* struck down as inconsistent with the treaty the multiple procurement system that had been adopted in the treaty's wake. It was only then that this Command, scrambling to find yet another means of disadvantaging and possibily eliminating Rainbow, came up with the current provisions.

But the fact is that nothing new had occurred with respect to the Icelandic trade to cause a major reexamination of the RFP provisions—nothing except that the treaty, the Executive undertakings with respect thereto, and the Court's construction of the treaty obligations had given Rainbow a new lease on life. Since the measures discussed below had not previously been regarded as necessary or appropriate, and since the Sealift Command insists on applying them now for the first time in the absence of new operational developments in the Icelandic trade, the conclusion is compelling, and the Court finds, that the new measures are simply means to frustrate once again Rainbow's efforts to survive economically and to carry freight between the United States and Iceland in competition with Icelandic shipping interests. These provisions are not measures genuinely adopted to safeguard governmental interests; the claim that this is their purpose is mere pretext.

The government, no doubt inadvertently, acknowledges this truth when it states that "[f]ollowing the issuance of the preliminary injunction, [the Military Sealift Command] again reviewed its requirements for restric-tive specifications dealing with the carriage of goods to Iceland."[26] Why a review following the issuance of the injunction? What did the injunction have to do with the objective circumstances of the United States–Iceland trade? If the Sealift Command at that juncture saw a need for canvassing possible restrictive specifications, that need could only have been stimulated by the desire to circumvent the injunction and to deprive Rainbow once again of its rights under law. This conclusion is buttressed by the circumstance that every single new specification adopted at that time would have the effect of crippling one aspect or another of Rainbow's operations and hence of undermining its viability.

In short, the current set of measures is as suspect as the false freight rate claim made by the Navy in 1985;[27] its false assertion that military aircraft were "available" to take over the freight-carrying functions from Rainbow in 1986;[28] its sudden, unsuccessful challenge of Rainbow as a small business;[29] and its subsequent distortion of the meaning of the treaty.[30]

Second, all the "specific" issues which divide the parties revolve around one element—is the Navy required to seek the most economical means of transporting military cargo to and from Iceland, or must it depart from that standard as a consequence of the treaty and the undertakings made pursuant thereto? The answer, plainly, is that the treaty vested rights in the "current carrier," *i.e.*, Rainbow, that override the Navy's current emphasis on the most economical means of carriage.

**25.** The 1987 procurement, being the one closest in time to the adoption of the treaty, may be regarded as constituting the Navy Department's appropriate interpretation of the treaty. *Cf. Lowe v. Securities and Exchange Commission,* 472 U.S. 181, 216, 105 S.Ct. 2557, 2576, 86 L.Ed. 2d 130 (1985) (White, J., concurring).

**26.** Defendants' Motion to Dismiss at 7. Admiral Piotti, Commander of the Military Sealift Command, went so far in his persistent efforts to disadvantage Rainbow as to recommend at the same time that the treaty (or rather the MOU) be renegotiated so as to escape the effect of the Court's rulings. However, the Department of State was willing to promise only that it would conduct a review of the MOU's operations. *See* exhibits attached to the brief of the maritime unions. Opposition, Annex A.

**27.** *See* pp. 340–341, *supra.*

**28.** *See* p. 341 *supra.*

**29.** *See* p. 342, note 9, *supra.*

**30.** *See* p. 342, *supra.* While these various measures were taken in the name of the Department of the Navy, their author appears to have been Admiral Piotti, Commander of the Military Sealift Command.

A moment's reflection will confirm that this is so. If the usual award procedure had been contemplated, the special protections accorded to the "current carrier" would have been superfluous; Rainbow always had the right to bid like every other company and to be awarded the contract if its bid was lower than those of all the others. Plainly, the representations made to the Senate were intended to have the effect of granting to Rainbow, the current carrier, an advantage over what would have been the award process in the absence of such representations.

Although the government suggests otherwise, departure from the most economical purchasing policy hardly constitutes a novel concept, either in general or with respect to the Cargo Preference Act.

The statutes, the regulations, and the treaties entered into by the United States are replete with instances where, for one public policy reason or another, a departure occurs from the standard for which the government argues here—that the government is entitled to reject those contracts that are not the most economical available. Minority set-asides, small business provisions, special privileges allowed veterans, purchases of agricultural commodities above market price—these are just a few of the programs in that category. And to the same effect is of course the Cargo Preference Act itself which requires shipping on United States-flag vessels for certain cargo in order to foster and protect the American merchant marine, *American Maritime Association v. United States,* 766 F.2d 545, 548 (D.C.Cir.1985), even though such shipping may be more costly to the United States government than shipping in Panamanian, Liberian, or other foreign-flag bottoms.

As the Court of Appeals said in *American Maritime Association, supra,* "Congress enacted these statutes to create a strong domestic merchant marine capable of competing with foreign carriers in the world market, and each act recognizes that

foreign subsidies and high domestic labor costs place American-built and American-operated ships at a competitive disadvantage with foreign vessels in the absence of government assistance." 766 F.2d at 548.[31] One means of accomplishing these objectives was to provide "indirect subsidies" to United States-flag vessels by "reserving certain cargoes, called preference cargoes, for those ships and by allowing domestic bulk operators to bid for preference cargos at rates well above world rates." *Id.*

## IV

■ The question that must be considered next is what was meant when it was decided between the Executive Branch and the Senate that Rainbow was not to be disadvantaged as a result of the treaty. The government argues that Rainbow is not being disadvantaged; that the Navy always had the power under the 1904 Act, even absent the treaty, to write new and special conditions into the contract awards, and that it is just now for the first time availing itself of that power. That contention posits a disingenuous way of escaping a solemn commitment, and one that is unfortunately consistent with the government's course of conduct from the very beginning of this controversy—too clever by half.

The Senate plainly did not have the purpose to secure from the Navy the meaningless assurance that, although the pre-treaty conditions would apply, the Department nevertheless could, in the exercise of its pre-existing inchoate power, restructure the competition in such a way as to cripple Rainbow in the Iceland military cargo trade. The government was bound as a result of the ratification process not to "disadvantage [Rainbow] on account of the treaty." What the ratification hearings and reports demonstrate is that, when the Senate Foreign Relations Committee issued Report No. 27, and when Mr. Derwinski expressed his concurrence on behalf of the Executive, it was intended that, except for

---

**31.** By helping to maintain a domestic merchant marine fleet, the cargo preference laws are *inter alia* a vital component of our national defense.

*See, e.g.,* S.Rep. No. 27, 99th Cong., 2d Sess. 3 (1986).

the 65–35 division of the trade between an American and an Icelandic shipper, the status quo ante would be reestablished, and that, notwithstanding that one change, Rainbow was to have the same status in the Icelandic trade that it had prior to the treaty approval.

That construction is buttressed by the "economic viability" phrase used in the Senate Report. There was, as indicated above, a specific undertaking to maintain Rainbow's viability—an undertaking that has meaning and must be respected. Rainbow's guaranteed ability economically to survive may no more be destroyed by the back door of the imposition of conditions never heretofore required in the Icelandic military cargo trade than by the more direct means of paying Rainbow less than the normal renumeration for cargo transportation. The maintenance of the "current carrier's" economic viability was a central condition in the ratification of the Icelandic treaty; it plainly is violated by a change in the customary economic environment of the Icelandic trade in the wake of the treaty so as to undermine that carrier's ability to exist.

This does not mean, as the government would have it, that Rainbow claims or must be given a "property right" in the Iceland military cargo trade or that the Navy is forbidden ever to vary the terms of the contracts. What it does mean, however, is that the Navy, having proceeded for years on the basis of a certain pattern of awarding Icelandic cargo contracts pursuant to the 1904 Act, could not, as soon as the treaty took effect, drastically change that pattern in a number of ways, each of which has the effect, and most probably the purpose,[32] of making it impossible for Rainbow to participate in that trade on a basis that leaves it economically viable. What it also means is that Rainbow may not be subjected to requirements that are different and that leave it worse off than it was under the Cargo Preference Act prior to the signing of the treaty.[33] But that, as will now be seen, is precisely what the Military Sealift Command did in the proposed 1988 procurement.

Among the provisions included in that procurement—provisions that had never been a part of any prior procurement with respect to that trade and that were not a part of it in 1987[34]—are the following.

The original 1988 RFP would have permitted carriage by the owners of small vessels ("supply boats") that, unlike Rainbow, lack the capability to carry sixty-five percent of the trade, and thus to require Rainbow to compete under entirely new and different conditions. The Sealift Command, recognizing the patent impropriety of this scheme, subsequently modified it somewhat in the proposed new RFP. That RFP would have bids of other carriers approved if they are theoretically able to carry sixty-five percent of the cargo (without regard to the number of vessels employed); however, the carriers are not required actually to commit space sufficient to carry sixty-five percent of the Iceland trade.[35]

---

**32.** *See* Part I, *supra.*

**33.** The government continues to distort the record when it maintains that the treaty protects only "a U.S. flag carrier, not necessarily the incumbent." Motion to Dismiss at 17. Similarly, the government purports to instruct this Court to review the procurement for the rights of "all U.S.-flag carriers interested in the carriage of military cargo between the United States and Iceland." Defendants' Reply Brief at 3.

As must by now be abundantly clear, the protections of the treaty were meant to protect the "current carrier." Moreover, since there had been no other American carrier in the Icelandic trade for many years, and the entry of none was at all likely if only because of the

Navy's hostility to non-Icelandic carriage of the cargo, the government's solicitude for some other, non-existent carrier is, to put it gently, disingenuous. The government compounds the misleading character of its submissions when it states that for twenty years all military cargo was carried on ships other than Rainbow's, Defendants' Reply Brief at 12 n. 11, without revealing that these were all Icelandic ships, not American-flag carriers.

**34.** Except for the time charter element that was favorable to Rainbow and that was eliminated for 1988. *See* pp. 348–349, *infra.*

**35.** The space apparently needs to be adequate only for thirty-five percent of the trade.

To allow Rainbow's putative competitors to bid on sixty-five percent of the trade although committing vessels with only a thirty-five percent capacity would not only be changing the character of the competition as it existed under the Cargo Preference Act,[36] in violation of the representations made at the time of the ratification of the treaty, but it would also effectively eliminate Rainbow. As the Sealift Command undoubtedly knew, Rainbow could not conceivably compete on this basis because its vessel, the "Rainbow Hope," would have fixed costs relating to at least sixty-five percent of the Icelandic trade when others, by committing only one-half the space to that trade, could reduce their costs by half, allowing them to operate at a profit on a thirty-five percent basis. Once Rainbow was eliminated, the small supply boat operators could be expected to depart, and the Icelandic shipping companies would again have the monopoly—apparently the purpose of this and the other recent manipulations of the RFP provisions.

Next both the "Rainbow Hope" and the Icelandic vessels have regularly carried cargo that was not and could not be containerized, and that was therefore in underdeck stowage. Here again, the Sealift Command has largely eliminated the requirement for protected underdeck stowage of uncontainerized cargo, although such a requirement had always theretofore been regarded as necessary. Here again, the post–1987 change represents a transparent effort to make it possible for small supply boats to take over part of the cargo, at least until Rainbow has been driven from the Icelandic trade. And here again, this change does not maintain the competition as if the Cargo Preference Act had been in effect in the Icelandic trade, as the Navy has the legal obligation to do in view of the treaty ratification undertakings.

Further, following the appearance of Mr. Derwinski and Admiral Piotti before the Senate Committee at which the issue of the viability of Rainbow was discussed, the Sealift Command expressed its intention to use a time charter to achieve the viability objective. The time charter issue arose because Rainbow was being reduced from the possibility of carriage of one hundred percent of the Icelandic trade to only thirty-five percent of that trade.

It was obvious to the Navy then, and it is obvious to the Court now, that a ship that operated at full capacity when it was entitled to carry all of the trade will be economically disadvantaged if it is restricted to the carriage of only thirty-five percent of that trade, unless the government takes steps to vitiate the disadvantage caused by such a reduction. The means initially selected to ensure Rainbow's economic viability in these circumstances was the leasing of the "Rainbow Hope" full time, and its use outside the Icelandic trade on an as-needed basis. Indeed, Admiral Piotti himself—who has proved himself to be an implacable foe of Rainbow and American shipping in the Icelandic trade—testified when the time charter issue was put to him, that "[i]n the carriage of thirty-five percent of the cargo, it was up to us to insure that the carrier would recover its fully distributed cost plus make a reasonable profit," and when asked whether the method employed was a time charter, he answered in the affirmative.[37]

Since that time, the Sealift Command has rejected the time charter concept, and Rainbow would thus be limited to a thirty-five percent use of its large "Rainbow Hope" vessel—a certain prescription for economic collapse.[38] The time charter is an integral part of the Executive's commitment to the Senate in terms of Rainbow's economic viability, and it may not now be jettisoned.[39]

---

**36.** No small-vessel American-flag carriers had ever competed in the Icelandic trade.

**37.** Piotti deposition at 44–45; *see also,* pp. 36–37.

**38.** The MOU itself provides that the contract award shall be such that it "adequately covers the carrier's costs, assuming normal efficiencies

of operation, plus a reasonable profit." Maritime Union Opposition at 8.

**39.** It may be that the government could devise other means to ensure Rainbow's economic viability; however, at this time the only means seriously proposed either by the Navy or by Rainbow is the time charter.

Finally, the Sealift Command has decided that a self-sustaining vessel, *i.e.,* one with its own cranes, such as is represented by the "Rainbow Hope," is no longer needed on this route. The Command notes that mobile cranes are available in Iceland, and that these cranes can be sent to the port of Njardvik. Even Eimskip, the Iceland Steamship Co., refutes this Navy contention, stating, "[i]n particular, the lack of adequate crane facilities at Njardvik sometimes causes carriers to take extraordinary, time-consuming and expensive measures to offload their vessels. A mobile crane may be required which must be ordered from out of town if not available in Njardvik. The unloading process is much slower in such circumstances so that vessel time in port is increased beyond what may be feasible to conduct a viable commercial operation." Response of Iceland Steamship Co., Ltd. to Defendants' Motion to Dismiss in Part or for Summary Judgment at 14–15.

While the Court has not undertaken to discuss herein every single change from previous practice the Navy has effected, enough has been said to support the conclusion that the government has violated the undertakings it gave to the Senate, in that Rainbow has been severely disadvantaged with respect to the Icelandic trade and its economic viability.[40]

## V

This case presents a sorry saga of duplicity. What is particularly mystifying about its history is why the government, acting through the Departments of the Navy and Justice, persists with iron determination to put out of business a small American maritime carrier in order to please foreign shipping interests, and why this is being done at a time when America's merchant marine has been decimated and most of its merchant seamen have lost their jobs to those working on foreign flag vessels.

As the above recitation of events demonstrates, this governmental effort has proceeded systematically now for over three years, buttressed by false sworn statements, and notwithstanding law, regulation, treaty obligation, and solemn undertaking. As a consequence of this effort, a small American corporation has had to fight for its life and the livelihood of its sailors, no doubt at great and potentially crippling expense, again and again and yet twice again. The arrogance of power has seldom been displayed in more telling fashion.

Much has been said and written in recent years, some of it well justified, about the intrusion of the Judiciary into areas of policy-making that are properly reserved to the political branches of government. But the courts legitimately can and must perform the function of calling a halt when governmental officials, in the name of Executive prerogative, oppress citizens in violation of law, regulation, and plain fair dealing. Certainly the courts have an obligation to provide the protective umbrella of the law when, as here, either for foreign policy advantage or simply out of pique at resistance by means of litigation, the Executive denies to a small American company the rights granted to it, as to all citizens, under law.

Oliver Wendell Holmes, one of our most distinguished jurists, said sixty years ago certain governmental action injurious to citizens would not be countenanced "while this Court sits."[41] That principle, which has been invoked several times since then in other cases involving the protection of citizens' rights,[42] is still alive, and not merely at the level of the Supreme Court.

---

**40.** Eimskip, the Iceland Steamship Co., Ltd., an intervenor herein, in addition to commenting on the principal issues more or less along the lines of the government's submissions, argues that the Court should protect it from competition by American carriers with respect to commercial cargo. The Senate's ratification processes, which are at issue here, were designed to protect United States-flag carriers, not Icelandic vessels.

**41.** *Panhandle Oil Co. v. Knox,* 277 U.S. 218, 223, 48 S.Ct. 451, 453, 72 L.Ed. 857 (1928) (Holmes, J., dissenting).

**42.** *See, e.g., Marsh v. Chambers,* 463 U.S. 783, 795, 103 S.Ct. 3330, 3338, 77 L.Ed.2d 1019 (Burger, C.J.).

A permanent injunction prohibiting implementation of the latest set of measures adopted by the Navy is being issued contemporaneously herewith.[43]

## ORDER

Upon consideration of plaintiffs' motion for summary judgment, defendants' motion for partial summary judgment and to dismiss, and the submissions of all the parties, including those of the International Organization of Masters, Mates and Pilots, and of the Iceland Steamship Co., Ltd., and the entire record herein, it appearing that there are no material facts genuinely in dispute, and that plaintiffs are entitled to final judgment as a matter of law, it is this 15th day of November, 1988

ORDERED that the motion of plaintiff Rainbow Navigation, Inc. for summary judgment be and it is hereby granted, and that defendants' motion be and it is hereby denied; and it is further

ORDERED that the 1988 RFP, No. 0003388R8600 for the Iceland military cargo trade challenged in this case, fails to meet the applicable requirements of law, treaty, and regulation, and that the proposed RFP, which defendants offered *sua sponte* to this Court in connection with their motion for partial summary judgment, also fails to meet these requirements.

For the reasons set forth in the accompanying Opinion, it is further

ORDERED that any procurement conducted by defendants for the Iceland trade shall be in compliance with the following criteria:

1. Consistent with the treaty between the United States and Iceland, sixty-five percent of the trade shall be awarded to the low bidder, and the remainder shall be awarded to the next lowest bidder of the other country, on the basis of a single competition under which each bidder shall offer, and shall be required to provide service capable of carrying at least sixty-five percent of the trade;

2. Except as provided in paragraph 1 hereof, any competition for the military cargo trade between the United States and Iceland shall operate with respect to American flag vessels as if the Cargo Preference Act of 1904 were still fully in effect; the current American-flag shipper Rainbow Navigation, Inc., shall not be disadvantaged on account of the treaty; and the requirements imposed upon its American-flag vessels shall be the same as if the Cargo Preference Act of 1904 were still fully in effect; and

3. The economic viability of the current American-flag carrier may not be adversely affected by the implementation of the treaty (including the fact that its vessel or vessels may carry only thirty-five percent of the trade, that is, less than they would have carried under the Cargo Preference Act of 1904) and defendants shall affirmatively structure the competition to include a time charter arrangement or some other means equally effective to ensure that the continued economic viability of such carrier is maintained as if the Cargo Preference Act of 1904 were fully in effect; and

4. Except as otherwise ordered by the Court, any competition for the United States–Iceland cargo trade shall be conducted as a small business set-aside, in accordance with all applicable statutory and regulatory requirements.

---

**43.** In terms, that injunction protects only Rainbow, the current carrier, which is the only shipper-plaintiff herein. The Court is not called upon to decide in this lawsuit, and it does not decide, whether and to what extent other American-flag carriers may also be entitled to enjoy the protection provided by the commitments made by the Executive in connection with ratification of the treaty.