RAINBOW NAVIGATION, INC., et
al., Appellees,

v.

DEPARTMENT OF the
NAVY, Appellant.

Nos. 89–5019, 89–5020.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 6, 1990.
Decided August 24, 1990.

John P. Schnitker, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellant Dept. of the Navy in 89–5019.

Joanne W. Young, New York City, with whom David E. Short, Washington, D.C., was on the brief for appellant Iceland Steamship Co., Ltd. in 89–5020.

Frank J. Costello, Jr., with whom Benjamin L. Zelenko, Washington, D.C., was on the brief for appellees Rainbow Navigation, Inc. and International Organization of Masters, Mates & Pilots in 89–5019 and 89–5020.

Before RUTH BADER GINSBURG, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Rainbow Navigation, Inc. challenged, and the district court enjoined, the way in which the Navy seeks to implement the terms of an agreement between the United States and Iceland concerning the allocation, as between American and Icelandic companies, of the military cargo trade between the two countries. *Rainbow Navigation, Inc. v. Department of the Navy,* 699 F.Supp. 339 (D.D.C.1988). The agreement, which is embodied in a Treaty and a Memorandum of Understanding (MOU), requires the Navy to hold a competition among U.S.-flag and Icelandic carriers, and guarantees to merchant mariners of each country a minimum share of that trade.

The district court concluded, based upon statements made by officials of the Executive Branch during ratification proceedings in the Senate, that "the treaty vested [certain] rights in the 'current carrier,' *i.e.,* Rainbow." *Id.* at 345. In order to ensure that the Government does not violate those rights, the court (1) enjoined it from imposing conditions upon the competition that "leave [Rainbow] worse off than it was ... prior to the signing of the treaty," *id.* at 347; and (2) ordered it to "structure the competition to include a time charter arrangement or some other means equally effective to ensure [Rainbow's] continued economic viability," *id.* at 350.

We reverse the judgment and vacate the injunction issued by the district court. Nothing in the Treaty or the MOU, either on their faces or as illuminated during the ratification proceedings, vests any rights in Rainbow, as opposed to the U.S.-flag service generally, or requires the time charter or the other conditions that the district court imposed. In light of this result, we need not address the objections to the injunction that appellant-intervenor Iceland Steamship Co. (Eimskip) raises; we do, however, address, and find wanting, Eim-skip's objections to the conditions that the Navy imposed upon the competition.

## I. BACKGROUND

Rainbow Navigation operates the M/V RAINBOW HOPE, which in 1984 became the first U.S.-flag vessel since the late 1960s to carry cargo to a U.S. military base in Iceland. As a U.S.-flag vessel, it was able to take advantage of the Cargo Preference Act of 1904, 10 U.S.C. § 2631, which reserves the transportation of U.S. military cargo to U.S.-flag vessels to the extent "that the freight charged by those vessels is [not] excessive or otherwise unreasonable." The Military Sealift Command (MSC) awarded to Rainbow cargo transportation contracts representing 70% of the U.S. military cargo bound for the base at Keflavik—which is the full amount that Rainbow is capable of carrying—and to that extent displaced the Icelandic carriers it had previously used.

The resulting disruption in the longstanding trade relationship between the MSC and the Icelandic companies, such as Eimskip, led to friction in the diplomatic relationship between the United States and Iceland. This friction apparently induced the United States to make several unsuccessful attempts to restore to the Icelandic companies a larger share of the military cargo trade between the two allies. *See* 699 F.Supp. at 340–41.

The situation was eventually addressed in the September 1986 Treaty Between the United States of America and the Republic of Iceland to Facilitate Their Defense Relationship. Article I of the Treaty provides:

Transportation services for cargo transported by sea between Iceland and the United States for purposes of the Defense Agreement shall be provided by vessels of the United States and vessels operated by Icelandic shipping companies on the basis of competition between United States flag carriers and Icelandic shipping companies pursuant to this Article. Any such competition shall result in contract awards that ensure that both United States flag carriers and Icelandic shipping companies are able to maintain a

viable presence in the trade. To ensure achievement of these objectives, the percentage of cargo transported by sea for purposes of the Defense Agreement that is allocated between vessels operated by Icelandic shipping companies and vessels of the United States on the basis of such competition shall be determined by agreement between the United States and Iceland.

The simultaneously executed MOU implements the Treaty by calling for periodic competitions between U.S.-flag carriers and Icelandic shipping companies:

> Each competition shall result in contract awards to both an Icelandic shipping company and a United States flag carrier such that not to exceed 65 percent of the cargo shall be carried by the lowest bidder and the remainder shall be carried by the next lowest bidder of the other country. . . .

The Treaty and the MOU thus create an exception to the nearly absolute preference that U.S.-flag carriers enjoy under the Cargo Preference Act; they guarantee Icelandic shipping companies a minimum 35% share of the military cargo trade between the United States and Iceland, and provide them with an opportunity to compete for up to 65% of that trade.

During ratification hearings before the Senate Committee on Foreign Relations, Senator Mathias asked Edward J. Derwinski, Counselor to the State Department, what effect the Treaty would have on the "current American flag carrier"; he inquired, in particular, whether there are "any plans in effect to save harmless the current cargo carrier." Counselor Derwinski answered that

> the current carrier has been involved in a number of discussions with appropriate authorities, and despite the fact that we could not provide, obviously, within the treaty for specific protection for an entity, we did have in mind at all times the need to protect the interests of the current carrier.

The Committee Report on the Treaty, the pertinent part of which Counselor Derwin-

ski had reviewed and endorsed, recommended ratification

> only with the assurances of the Departments of State and Defense that . . . the treaty will be implemented in such a way that the existing United States-flag service in the Iceland trade would not be disadvantaged as a result of the treaty. The committee received those assurances at its hearing, and recommends advice and consent on that basis only.

The report further stated that "[t]he Committee understands and expects that the economic viability of the United States-flag service will be maintained as if the 1904 Act were fully in effect in the Iceland trade." S.Exec.Rep. No. 27, 99th Cong., 2d Sess. 3 (1986).

In 1987, the Navy held the first competition under the Treaty for the award of shipping contracts. In its Request for Proposals (RFP), it invited Icelandic bidders to submit alternative bids based upon carriage of the 65% and the 35% shares of the cargo; U.S. bidders, in contrast, were to submit bids for carrying 65% of the cargo (calculated per ton), and alternatively for a "time charter" (calculated per diem), under which the ship and crew would be available, when not carrying the 35% share of the military cargo to Iceland, "to meet other requirements of the Government on a worldwide basis" during the contract period. Among other specifications, the Navy required that a bidding vessel provide at least 90,000 cubic feet of underdeck stowage capacity and carry its own cranes on board for unloading; the time charter would be conducted as a small business set-aside. Rainbow, the only U.S.-flag carrier to participate, was underbid by an Icelandic competitor, which therefore secured the larger share of the contract. Rainbow entered into the time charter, to be used for carriage of the remaining 35% share and for service, as required, to other destinations.

In its RFP for 1988, the Navy included terms substantially different from those of the 1987 procurement. Bidders were to compete separately for the 65% and 35% shares. Bidders for only the smaller share

would thus no longer be required to provide space sufficient to carry 65% of the trade. The Navy also eliminated the time charter feature and the small business set-aside for the U.S. carrier; it further deleted various physical specifications, including cranes and underdeck stowage capacity, for bidders from both countries.

Instead of submitting a bid, Rainbow brought this suit in district court, claiming that the changes violated the terms of the Treaty and the MOU because they threatened to undermine Rainbow's economic viability. In April 1988, the district court issued a temporary restraining order, and in May a preliminary injunction, barring the Navy from implementing the procurement. The court also directed Rainbow and intervenor Eimskip to continue transporting the Iceland cargo under the terms of the 1987 competition.

Both Rainbow and the Navy moved for summary judgment. The Navy's motion was based upon a proposal to revise the RFP for 1988. It offered to hold a single competition, in which all bidders would be required to have the capacity to carry 65% of the Iceland cargo. It also offered to survey the "universe of potential bidders" and to conduct the competition, as it had in 1987, as a small business set-aside if, as required by regulation, there was "a reasonable expectation that ... offers will be obtained from at least two responsible small business concerns ... at fair market prices." 48 C.F.R. ch. 1, § 19.502–2(a). The Navy continued to oppose a time charter arrangement, as well as the imposition of restrictive specifications for the vessel or vessels to be used.

In November 1988, the district court granted summary judgment for Rainbow, holding that the 1988 RFP, in both its initial and newly proposed versions, violated the terms of the Treaty and the MOU. Based largely upon the above-quoted colloquy between Senator Mathias and Counselor Derwinski, the court held that the Government is required to guarantee, and the RFP threatened to undermine, Rainbow's economic viability, and that the Navy could not structure the competition so as to leave Rainbow in a worse position than it was in prior to the advent of the Treaty.

The court then imposed a number of specifications for the conduct of future procurements, which it deemed necessary in order to satisfy the requirements of the Treaty and to safeguard against further Navy efforts, as the court saw them, to dishonor the Government's representations to the Senate by "put[ting Rainbow] out of business." 699 F.Supp. at 349. The court permanently enjoined the Navy: to set aside future competitions for small business; to require that bidders have the capacity to carry at least 65% of the Iceland trade (thereby preventing small U.S. "supply boats" from competing for the 35% share of the trade); and to provide a time charter or "some other means equally effective to ensure that the continued economic viability of [Rainbow] is maintained as if the Cargo Preference Act of 1904 were fully in effect." Id. at 350. In the accompanying opinion, the court also said that future solicitations should specify underdeck stowage, and intimated that the Navy's reasons for abandoning the crane requirement are unconvincing. Id. at 348–49. Both the Navy and Eimskip filed timely appeals.

## II. THE NAVY'S APPEAL

The Navy contends that the court erred in requiring it to frame the competition in a way that will ensure Rainbow's economic viability, as opposed to the economic viability of U.S.-flag service generally, and that, even if Rainbow's viability must be assured, a time charter is unnecessary to that end. The Navy also argues that the Treaty neither entitles Rainbow to insulation from domestic competition, nor requires the imposition of conditions upon the competition in order to serve that purpose. Finally, the Navy challenges the district court's insinuation that it acted in bad faith when it specified new terms for the 1988 RFP.

Rainbow disavows any legal claim to an unconditional right to economic viability, arguing instead that it is entitled to compete "as if the 1904 Act, pre-Treaty market

conditions were in effect." Based primarily upon the Executive's representations, Rainbow contends that the Treaty protects it from competition by any U.S.-flag vessel other than one of that "class and type ... that could meet the pre-Treaty conditions in the trade." Rainbow thus concludes that the Navy must include certain restrictive specifications in its RFP that will disqualify smaller, domestic supply boats from bidding for the MSC's Iceland trade. It also concludes that the Navy must include a time charter provision in order to ensure that Rainbow will fully recover its fixed costs of operating a vessel capable of carrying 65% of the Iceland cargo. (According to Rainbow, "[t]his means that the U.S. flag is to be paid for the 65% share even though it is carrying the lesser amount of cargo [*i.e.*, 35%].")

■ Our analysis "must, of course, begin with the language of the Treaty itself." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982).

> The clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories."

*Id.* (quoting *Maximov v. United States*, 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963)). By its terms, the Treaty and the MOU require only (1) that the Navy award contracts by means of a competition; (2) in a manner that "ensure[s] that both United States flag carriers and Icelandic shipping companies are able to maintain a viable presence in the trade"; and (3) that the lowest U.S. bidder receive at least 35 percent of the cargo.

The Treaty protects the United States-flag service as a whole, therefore, rather than any particular carrier. Indeed, Counselor Derwinski stated as much when, in response to the question of whether the Treaty protects the "current American flag carrier," he said that the Government "could not provide ... within the Treaty for specific protection for an entity." The Committee report accepted his distinction, reporting only that "the Treaty will be implemented in such a way that the existing United States-flag service ... would not be disadvantaged." *See also* 132 Cong. Rec. 29,521 (1986) (Senator Pell reporting that the Administration had "assured the committee that the treaty will be implemented in such a way that the existing United States-flag service in the Iceland trade would not be disadvantaged").

Because the Treaty protects the survival of the U.S.-flag service as a whole, it imposes no obligation upon the Government specifically to ensure Rainbow's economic viability by, for example, offering it a time charter, or guaranteeing it payment for carrying 65 percent of the cargo even when it carries only 35 percent. Perhaps if it appeared that the trade would not otherwise be economically viable for any domestic carrier, then Rainbow would be entitled to such consideration, but Rainbow has made no such allegation. Indeed, in the course of defending the court-imposed requirement that the Navy conduct the procurement as a small business set-aside, which requires that there be at least two expected bidders, Rainbow expressly represents that there is "at least one [other] U.S. flag company that was actually operating a sister ship of the M/V RAINBOW HOPE and that had expressed an interest in bidding." Moreover, the district court's finding that if companies are permitted to bid for the 35% share without committing enough space for the 65% share, then Rainbow would face competition from smaller supply boats, clearly indicates that the presence of U.S. carriers in the Iceland trade does not depend upon Rainbow's participation. The district court's potentially off-setting finding that "[o]nce Rainbow was eliminated, the small supply boat operators could be expected to depart," 699 F.Supp. at 348, again leaving no U.S.-flag carrier to take the 35 percent share, is without support—at least once it is clear, as it is to us (see below), that the Navy is not acting in bad faith.

Similarly, nothing in the language of the Treaty or the MOU protects Rainbow from the competition of other classes of U.S.-

flag carriers, or requires the restrictive physical specifications that the district court imposed. The MOU clearly contemplates that there might be competition among U.S. carriers, and it guarantees a share of the cargo only to the lowest U.S. bidder, not to the lowest bidder in the particular class of vessel to which the RAINBOW HOPE belongs.

Because the Treaty and the MOU do not expressly support its position, Rainbow, like the district court, relies primarily upon the statements made or endorsed by the Executive Branch during the ratification proceedings. It argues that those statements are binding interpretations of the Treaty, and that, so interpreted, the Treaty requires the Government to assure Rainbow's viability and to leave it in no worse condition than it was in before the advent of the Treaty regime.

First, we are by no means convinced that the specific representations made by the Executive in this case are interpretations of what the Treaty requires, as opposed merely to representations about how the Administration then intended to implement the Treaty. Because neither appellant has pressed this point, however, we assume *arguendo* that the Executive's statements during the ratification process are relevant guides to interpretation of the Treaty.

█ Second, we do not accord those statements the same import that Rainbow does. Neither the remarks by Counselor Derwinski, nor the Committee Report quoted above, clearly indicates that the Executive Branch believed that it was obligated to protect Rainbow or Rainbow's class of vessel in particular, as opposed to the U.S.-flag service in general. Ambiguous ratification history cannot be allowed to obscure the meaning of clear Treaty language. And, as discussed above, it is clear that the language of the Treaty confers no rights particularly upon Rainbow or its class of vessels.

█ Nor is there merit to Rainbow's argument that the Navy's first approach to implementing the Treaty, *i.e.*, the 1987 RFP, with its restrictive physical specifications, reflects the Navy's contemporaneous interpretation of what the Treaty requires, and as such commands the special deference of the court, *see Air Canada v. U.S. Dep't of Transp.*, 843 F.2d 1483, 1486–87 (D.C.Cir.1988). The Navy asserts, and Rainbow provides no basis for doubting, that it included the requirements of the 1987 RFP only because it then thought that it could use the RAINBOW HOPE under a time charter, in non-Icelandic trades, and not because the Treaty required it to use those terms. Therefore, the inclusion of the specifications in the RFP for 1987 indicates not what the Navy believed the Treaty to require, but only what it believed the Treaty to allow. The elimination of those restrictive specifications from the RFP for 1988 is not a departure from the Navy's previous interpretation, but merely a reflection of what else, in the Navy's view, the Treaty permits.

We are also unable to uphold the district court's requirement that "any competition for the United States–Iceland cargo trade shall be conducted as a small business set-aside." 699 F.Supp. at 350. The court gave no indication of why it imposed this requirement, apart from its general determination to preserve the status quo as of 1987, the Navy's departure from which it perceived as being in bad faith. In light of the analysis in the preceding paragraph, however, that perception must be deemed erroneous. Moreover, neither the Treaty nor the MOU requires a small business set-aside, and Rainbow points to nothing else that could justify the district court's ordering it, apparently without regard to whether the multiple bidder condition of 48 C.F.R. ch. 1, § 19.502–2(a) is satisfied.

Finally, we note that the Navy has not implemented the Treaty in a manner that makes it impossible or even difficult for Rainbow to qualify as a bidder for the procurement. The likely effect of the Navy's decision to jettison the time charter and restrictive specifications of the 1987 RFP is only to expand the field of participants. The danger cited by Rainbow, and by the district court, is not that the U.S. presence in the Iceland trade will be entirely eliminated, but rather that domestic com-

petition will edge Rainbow out of the Iceland trade and lead to its replacement by a lower-bidding U.S. carrier. As we have seen, this is not a danger from which Rainbow is entitled to be protected.

### III. Eimskip's Appeal

Eimskip challenges the district court's failure to include in its injunction provisions designed to minimize the adverse effects that a time charter might otherwise have upon Eimskip's ability to compete with Rainbow, and its inclusion of the requirement that the vessel have its own cranes. Both points are rendered moot by our holding that the district court lacked authority to impose any conditions.

Regarding Eimskip's objection to the Navy's substituting Njardvik for Reykjavik as the principal site for unloading cargo, the carrier has not shown that the change threatens the economic viability of the Icelandic presence in the trade. Thus, Eimskip has failed to make out any inconsistency between the revised RFP and the terms of the Treaty or the MOU. Insofar as Eimskip's objection is based upon 10 U.S.C. § 2305(a), it is utterly without merit.

### IV. Conclusion

Nothing in the revised 1988 RFP is inconsistent with the requirements of the Treaty or the MOU. We therefore vacate the order of the district court, and hold that the Government is free to implement the procurement as proposed. For the reasons stated above, the judgment of the district court is

*Reversed.*