The ICELAND STEAMSHIP COMPA-
NY, LTD.–EIMSKIP and Van Ommer-
en Shipping (USA) LLC, Appellees,

v.

The UNITED STATES DEPARTMENT
OF THE ARMY and Louis Caldera,
Secretary of the Army, Appellees.

Transatlantic Lines–Iceland ehf.
and TransAtlantic Lines,
L.L.C., Appellants.

No. 99–5088.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1999.

Decided Jan. 11, 2000.

Michael Joseph argued the cause for appellants. With him on the briefs was Joseph O. Click.

David L. Smith, Assistant U.S. Attorney, argued the cause for the federal appellees. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Joanne W. Young argued the cause for the non-federal appellees. With her on the brief were David M. Kirstein, Lee T. Ellis, Jr., Richard A. Hibey, and Constantine G. Papavizas.

George J. Mannina, Jr., was on the brief for amicus curiae The Government of the Republic of Iceland. With him on the brief was Gary C. Adler.

Before: SENTELLE, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion concurring in part and dissenting in part filed by Circuit Judge KAREN LeCRAFT HENDERSON.

SENTELLE, Circuit Judge.

Appellants TransAtlantic Lines–Iceland ehf. ("TLI") and TransAtlantic Lines, L.L.C. ("TLL") are affiliated corporations and awardees of military shipping contracts for shipping between the eastern United States and Iceland. They appeal from an order of the district court allowing summary judgment in favor of appellees, Iceland Steamship Company, Ltd.–Eimskip ("Eimskip") and Van Ommeren Shipping (USA) L.L.C. ("Van Ommeren"), and requiring the U.S. Army to rebid the contracts. The district court required rebidding on two grounds: First, it held that a 1986 treaty entered into between the United States and Iceland prohibited the award of the contracts to appellants because of their affiliation with each other. Second, the district court held that the contracting officer's determinations of responsibility for appellants were arbitrary and capricious in that she failed to follow relevant solicitation procedures. Applying the deferential standard of review of executive branch decisions which govern in both these contexts, we reverse the district court and uphold the Army's award.

## I. Facts

### A. Overview

■ While the interpretation of an international treaty is implicated in this action, this is essentially a disappointed bidder case. *Cf. Elcon Enters., Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472 (D.C.Cir.1992); *CACI, Inc.–Federal v. United States*, 719 F.2d 1567 (Fed.Cir.1983). At stake are government contracts for shipping between the eastern United States and Iceland. Appellants were awarded the contracts on September 18, 1998, by the United States Army's Joint Traffic Management Office of the Military Traffic Management Command ("Army"). Appellees were losing bidders and the incumbent carriers on these contracts. Disappointed bidders may challenge a government contract award under the Administrative Procedure Act ("APA"), which empowers courts to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); *see Scanwell Lab., Inc. v. Shaffer,* 424 F.2d 859, 874 (D.C.Cir.1970).

### B. History

This action is the latest in a series of disputes over the military shipping contracts for trade between the United States and Iceland. We will briefly review the history of this trade and the earlier disputes to provide context for the current case.

The United States has maintained formal arrangements for the use of military facilities in Iceland since at least 1951, when the two countries entered into a defense agreement. *See* Defense Agreement Pursuant to the North Atlantic Treaty ("Defense Agreement"), May 5, 1951, U.S.–Ice., 2 U.S.T. 1195. Prior to 1984, Icelandic shippers traditionally serviced the U.S. military's Keflavik Air Base in Iceland. In that year, Rainbow Navigation, a newly formed United States flag carrier, took over the trade by invoking the Cargo Preference Act of 1904, 10 U.S.C. § 2631 (1994). That statute requires that American military supplies be carried by U.S. flagged vessels if available. *See Curran v. Laird,* 420 F.2d 122, 127–28, 133 (D.C.Cir.1969).

The government of Iceland asked that Icelandic shippers be given some accommodation in order to maintain Iceland's good defense relationship with the United States. At first, the U.S. Navy tried to disqualify Rainbow by invoking an exception in the Cargo Preference Act for excessive rates, but this was rejected as based on insufficient evidence. *See Rainbow Navigation, Inc. v. Department of the Navy,* 783 F.2d 1072, 1073, 1080–81

(D.C.Cir.1986). The Navy then tried to "dispense with Rainbow's services by a diversion of the cargo ... to military aircraft," but the District Court rejected this tactic. *Rainbow Navigation, Inc. v. Department of the Navy*, 686 F.Supp. 354, 355 (D.D.C.1988) (reviewing prior challenges).

Realizing that the Cargo Preference Act was a formidable barrier, the United States (through the State Department) and Iceland negotiated a treaty and memorandum of understanding in 1986. These documents are intended to ensure that the Iceland trade will be shared by United States flag carriers and Icelandic shippers. Article I of the treaty provides:

> Transportation services for cargo transported by sea between Iceland and the United States for purposes of the Defense Agreement shall be provided by vessels of the United States and vessels operated by Icelandic shipping companies on the basis of competition between United States flag carriers and Icelandic shipping companies pursuant to this Article. Any such competition shall result in contract awards that ensure that both United States flag carriers and Icelandic shipping companies are able to maintain a viable presence in the trade. To ensure achievement of these objectives, the percentage of cargo transported ... by Icelandic shipping companies and vessels of the United States on the basis of such competition shall be determined by agreement between the United States and Iceland.

Treaty to Facilitate Defense Relationship ("Treaty"), Sept. 24, 1986, U.S.–Ice., T.I.A.S. No. 11,098, at 3. The memorandum of understanding fleshes out how this competition should proceed:

> Transportation services for cargo transported by sea between Iceland and the United States for purposes of the Defense Agreement shall be provided by vessels of the United States and vessels operated by Icelandic shipping companies on the basis of periodic competitions between United States flag carriers and Icelandic shipping companies. Each competition shall result in contract awards to both an Icelandic shipping company and a United States flag carrier such that not to exceed 65 percent of the cargo shall be carried by the lowest bidder and the remainder shall be carried by the next lowest bidder of the other country....

Memorandum of Understanding in Implementation of the Treaty to Facilitate Defense Relationship ("MOU"), Sept. 24, 1986, U.S.–Ice., T.I.A.S. No. 11,098, at 2. The MOU is to be reviewed yearly and may be amended upon mutual agreement of the parties at any time. *See id.* at 3.

Upon ratification of the Treaty, Icelandic shippers were able to claim back some of Iceland trade. In fact, the Icelandic shippers got back 65 percent of the trade. Although the MOU does not guarantee this allocation, Icelandic shipping companies have much lower costs than U.S. flag carriers, *cf. Aeron Marine Shipping Co. v. United States*, 695 F.2d 567, 569 (D.C.Cir. 1982), and generally will be able to submit lower bids than their American competitors. Therefore, in light of this economic reality, the lowest bidder among Icelandic shipping companies will generally be awarded 65 percent of the trade, and the lowest bid from a U.S. flag carrier will be awarded the remainder.

We interpreted the Treaty and MOU in *Rainbow Navigation, Inc. v. Department of the Navy*, 911 F.2d 797 (D.C.Cir.1990). Rainbow Navigation claimed that the Treaty and MOU, supplemented by legislative testimony on the ratification of the Treaty, required a bidding process protecting Rainbow by including restrictive specifications to disqualify small domestic supply boats. It also contended that the solicitation must include a provision ensuring it could recover the fixed costs of operating a vessel which could carry 65 percent of the trade even if awarded only 35 percent. *See id.* at 801. We rejected the theory that Rainbow should be accord-

ed any greater protection than other U.S. flag carriers, seeing nothing in the language of the Treaty or MOU requiring such a result. We summarized the requirements of the Treaty and MOU:

> By its terms, the Treaty and the MOU require only (1) that the [government] award contracts by means of a competition; (2) in a manner that "ensure[s] that both United States flag carriers and Icelandic shipping companies are able to maintain a viable presence in the trade"; and (3) that the lowest U.S. bidder receive at least 35 percent of the cargo.

*Id.*

## C. Present Controversy

This brings us to the present controversy. On January 30, 1998, the Army[1] issued a solicitation for the Iceland trade, specifically stating that awards would be allocated "[p]ursuant to the Treaty and its implementing Memorandum of Understanding." Of course, the solicitation stated numerous other requirements for bidders to meet. Those we mention here are relevant to appellees' non-treaty related challenges. The solicitation required the Contracting Officer to make an "affirmative determination" of offeror responsibility. It cited to Federal Acquisition Regulation ("FAR"), Subpart 9.1 on Responsible Prospective Contractors, which mandates that an awardee "[h]ave adequate financial resources to perform the contract, or the ability to obtain them." 48 C.F.R. § 9.104–1(a) (1998). The solicitation also stated that each offer should "include sufficient evidence to establish control or irrevocable right to gain control of the necessary vessels in sufficient time to commence service on [the contract start date]."

The solicitation stated that offers were due on March 5, 1998, and the contracts had a proposed starting date of May 1, 1998 because the prior contracts were set to expire on April 30, 1998. Due to delays in the bidding process, the proposed start date was moved back to November 1 and the incumbent carriers given a six month extension.

TLI and TLL each submitted bids.[2] TLI and TLL have substantially similar ownership and are principally managed by Gudmundur Kjaernested, who is a citizen of Iceland and United States resident. At the time the original bids were submitted, Kjaernested and Brandon C. Rose, a United States citizen, were the primary owners of both companies. Despite this close relationship, TLI and TLL are separate corporate entities. TLL is a limited liability company registered in Delaware, and TLI is an Icelandic company registered in Iceland.

The Army announced the awards on September 18, 1998. TLI, the Icelandic company, was the lowest overall bidder and the Army awarded it a contract covering 65 percent of the trade. The Army awarded TLL a contract for the remaining 35 percent because it was the lowest bid among U.S. flag carriers.

The Contracting Officer also made the required determination that each company was a responsible contractor. As to TLI, the Contracting Officer cited a bank letter tentatively approving a $1 million credit line to TLL. This letter noted the bank's prior history with TLI and TLL stockholder Brandon Rose as being important in setting up the line of credit. The Contracting Officer also had a letter from Kjaernested stating that the credit line was available to both TLI and TLL. As to

---

**1.** Although the Navy handled the administration of the bidding process in the past, *see, e.g., Rainbow,* 911 F.2d at 799, this responsibility was transferred at some point to the Army, who administered this solicitation through the Joint Traffic Management Office of the Military Traffic Management Command.

**2.** We are referring to separate bids that TLI and TLL submitted. TLI and TLL also submitted two other bids which were rejected because they were in the nature of joint venture proposals.

TLL, the Contracting Officer's responsibility determination concluded that TLL had "the necessary equipment and facilities to perform this contract." Before the officer were four letters from marine companies pledging vessels, with varying levels of specificity.

Eimskip and Van Ommeren filed protests with the U.S. Government Accounting Office ("GAO"). Under the Competition in Contracting Act, this action automatically stayed the awards. *See* 31 U.S.C. § 3553(b)-(d) (1994). On October 23, 1998, approval to override the stay was granted by the Assistant Secretary of the Army. Eimskip then filed this suit in the district court causing the GAO to dismiss the bid protest. *See* 4 C.F.R. § 21.11 (1997). TLL, TLI, and Van Ommeren timely intervened.

During this same period, the government of Iceland sent a diplomatic note to the U.S. Department of State protesting the awards. Citing the Treaty and MOU, Iceland stated two problems it had with the awards to TLI and TLL: (1) that as commonly owned companies, TLI and TLL could not be awardees, and (2) that TLI was not a true Icelandic shipping company. Specifically, the note stated:

The Government of Iceland has concluded, based on available information, that [TLI and TLL] are affiliated companies under common direction, ownership and/or control of Icelandic citizens, and that [TLI] lacks the necessary experience, technical capability, financial responsibility, and material connection with Iceland.

. . . .

. . . [T]he Government of Iceland interprets the Treaty and [MOU] to preclude awards by the [Army] of both the Icelandic and United States portions of the trade subject to the Treaty and [MOU] to affiliated companies under common direction, ownership and/or control.

. . . [T]he Government of Iceland interprets the Treaty and [MOU] to preclude any award of the Icelandic portion of that trade to any company that lacks the experience, technical capability, financial responsibility, and material connection with Iceland that are necessary to ensure . . . maintenance of a viable presence of Icelandic shipping companies in that trade providing for the security of Iceland and the equitable participation of Iceland in the benefits of the Defense Agreement. . . .

Iceland Ministry of Foreign Affairs, Diplomatic Note to the Department of State of the United States of America (Sept. 28, 1998), Joint Appendix ("J.A.") 124, 126 ("Iceland Diplomatic Note").

The U.S. State Department issued a diplomatic note on December 30, 1998 in response to Iceland's position:

The Government of the United States considers its actions in the recent competition and award of the Icelandic military cargo contract are fully consistent with the Treaty and MOU.

. . . .

. . . Until the recent contract competition, the Government of Iceland has not expressed any views regarding the qualifications of particular Icelandic companies nor informed the Government of the United States that it held views that appear to the United States to go beyond the plain meaning of the words themselves.

. . . .

. . . The Government of the United States notes that none of [the] four criteria cited by the Government of Iceland to render [TLI] a non-Icelandic shipping company appears in the text of the Treaty or MOU.

. . . .

It is the position of the Government of the United States that none of the terms in the Treaty or MOU require recourse to supplementary means of interpretation when the terms of the treaty are plain and unambiguous. . . . Iceland,

consistent with its obligations under international law, is of course free to enact specific statutory or regulatory criteria for "Icelandic shipping companies" should it wish to do so (just as the internal law of the United States provides specific criteria for "U.S. flag vessels").

. . . .

. . . [T]he Government of Iceland [has] expressed its concern that there had been no effective competition because of the relationship between two of the bidders. The Government of the United States, however, followed its own contracting processes in this procurement and believes that the goal of competition was indeed met. . . .

. . . [T]here is no evidence of an attempt to eliminate competition from other bidders. . . . [T]he two companies . . . were not competing to fill the same contract requirement. Rather, the Iceland company submitted a proposal for the 65% share while the U.S.-flag company submitted one for the 35% share. . . .

Since the portion of the cargo trade which would be reserved for Icelandic interests was determined on the basis of competition between offers submitted by entities from each country, it is the view of the United States that any relationship between Icelandic companies and companies operating U.S.-flag vessels was and is irrelevant to the fact that there was full, vigorous, and open competition in full compliance with the Treaty and MOU.

U.S. Department of State, Diplomatic Note to the Embassy of the Republic of Iceland (Dec. 30, 1998), J.A. 128, 128–35 ("U.S. Diplomatic Note").

Meanwhile, appellees' district court action was proceeding. Appellees challenged the award on two primary grounds which are before us on appeal. First, they claim

that the Treaty and MOU prohibited awards to TLI and TLL for the same reasons cited by the Iceland Diplomatic Note: (1) because the common ownership of TLI and TLL made the bidding process something other than a competition and (2) because TLI is not a true "Icelandic shipping company." Appellees also make two challenges to the Contracting Officer's responsibility findings: (1) that TLI was a financially responsible contractor, and (2) that TLL was responsible in that it had a vessel ready to perform.

After initially denying a motion for a preliminary injunction, the district court granted appellees' motions for summary judgment on February 3, 1999, and ordered the Army to cancel the contracts and rebid. The court first ruled that the ownership status of TLL and TLI defeated the MOU's requirement of a single competition for the Icelandic trade. The court also found that the Army's decisions under the solicitation procedures were arbitrary and capricious on both counts. The district court was not yet aware of the recently-issued U.S. Diplomatic Note addressing the treaty issues.

TLL, TLI, and the Army appealed the judgment of the district court. We granted a stay pending appeal. The Government of Iceland submitted an amicus brief on behalf of the losing bidders. The Army originally dismissed its appeal, but has asked leave to file a brief which addresses only the treaty issues.[3]

Addressing the treaty issues first, we conclude that the Army's contract awards to TLL and TLI do not violate the plain language of the Treaty and MOU. As to the responsibility determinations of the Contracting Officer, the context of which requires an especially deferential version of arbitrary and capricious review, we determine that the Army's actions were permissible.

**3.** The Army's brief does not address the responsibility determinations of the Contracting Officer. At oral argument the Army clarified

that it has not changed its position on these issues but has simply chosen not to appeal the district court's decision.

**458**

## II. Treaty Issues

### A. Standard of Review

██ When interpreting a treaty or memorandum of understanding, we are guided by principles similar to those governing statutory interpretation. We "must, of course, begin with the language of the Treaty itself." *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). At this level, "[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Id.* (quoting *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963)).

██ To the extent that the meaning of treaty terms are not plain, we give "great weight" to "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement." *Sumitomo,* 457 U.S. at 184–85, 102 S.Ct. 2374; *see also In re Papandreou,* 139 F.3d 247, 252 n. 2 (D.C.Cir. 1998). Although "we give somewhat less deference" where an agency and another country disagree on the meaning of a treaty or MOU, where an agency has "wide latitude in interpreting the MOU, ... we will defer to its reasonable interpretation." *Air Canada v. U.S. Dep't of Transp.,* 843 F.2d 1483, 1487 (D.C.Cir.1988).

██ In this case, we deem it proper to refer to the U.S. Diplomatic Note for guidance as to the meaning of the terms "competition" and "Icelandic shipping companies" under the Treaty and MOU, although the Note was not in the record before the district court. Although the Army may have considered the Note confidential, TLL and TLI apparently had access to it since they presented it to this court at the time of the initial application for temporary restraint. We would not, of course, consider evidence offered to support a factual proposition which had not been before the district court. However, the Diplomatic Note is not offered as evidence to support a factual proposition, but rather as an interpretive guide for our use in making a legal interpretation. And although all parties refer to the Note in their briefs, appellees do not object to those references, or our consideration of the Note, on the ground that it was not in the record below. Because it is important for this court to have the guidance of the agency responsible for negotiating this treaty, we consider the Note along with the Army's arguments adopting the same views. A diplomatic note is an official position of the type which is unlikely to be taken for litigation purposes, and is entitled to deference. *Cf. Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996).

### B. Competition

██ Having reviewed the applicable principles guiding our reasoning, we proceed to the issue of whether the affiliated status of TLI and TLL transformed the bidding process into something other than a "competition." We hold that there was still a "competition" under the Treaty and MOU. The plain meaning of the Treaty and MOU comport with this view, but to the extent the meaning of the word "competition" is in any doubt, it does not prevent bids of separate corporate entities that have common ownership. Therefore, we agree with the U.S. Diplomatic Note that the bidding process was a competition.[4]

On a surface level, a "competition" certainly occurred between U.S. flag carriers and Icelandic shippers. TLI and TLL were competing against other U.S. flag carriers and Icelandic shippers. Regardless of whether TLI and TLL competed against each other, nothing in the Treaty and MOU suggests, as appellees contend,

---

4. We have no occasion to consider whether appellants' behavior would or would not constitute "competition" within the meaning of the antitrust laws.

that each and every bidder must compete against each and every other bidder.

In fact, that has never been the nature of the competition. Because bidders may bid for between 35 percent and 65 percent of the trade each has never competed against all. Because TLI was effectively vying for the 65 percent portion and TLL for the remainder, perhaps it can be said they were not in head to head competition. But the same can be said for Eimskip and Van Ommeren and all the other bidders. Eimskip, being an Icelandic shipper, and Van Ommeren, a U.S. flag carrier, were not in direct head to head competition either. The bottom line is that this conception of a "full competition" has nothing to do with the affiliation of bidders. Under the appellees' theory, a competition could not occur unless each and every bidder requested 100 percent of the trade. The Treaty and MOU do not require such 100 percent bids.

On a deeper level, a form of head to head competition does occur between all bidders. Every bidder is submitting bids in a single competition to award the shipping trade. All the bids must be compared in the first instance to determine who is the overall lowest bidder. Even though TLL and Van Ommeren (or other U.S. flag carriers) have little chance of being the lowest overall bidder, they still compete against everyone else. In this portion of the competition, even TLI and TLL's bids are stacked against each other.

While appellees object to the substantially common ownership of TLI and TLL, it is worth noting that the Comptroller General allows affiliated companies to submit multiple bids for the same procurement. In *Pioneer Recovery Sys., Inc.*, B–214878, 1984 WL 46915, at *2 (Comp. Gen. Nov. 13, 1984), the Comptroller General stated that "[t]he general rule is that multiple bids may be accepted unless such multiple bidding is prejudicial to the interests of the government or other bidders in which case it is clear that the reason for multiple bidding was not legitimate." *See*

*also David I. Abse,* 51 Comp. Gen. 403, 404–06 (1972) (upholding award where high and low bids were signed by same person of affiliated companies). While the Comptroller General's opinion is not binding precedent, we agree that the existence of affiliation does not negate the presence of "competition" in the usual sense of that word.

The language of the Treaty and MOU does not define "competition" in any peculiar way requiring a different result. There is "nothing in the Treaty ... clearly prohibit[ing] a relationship between the two awardees." *Iceland Steamship Co. v. United States Dep't of the Army,* slip op. at 4, No. 98–2631 (D.D.C. Nov. 10, 1998) (order denying preliminary injunction). The Treaty contemplates awards "on the basis of competition between United States flag carriers and Icelandic shipping companies," and the MOU uses similar language. Neither document addresses a situation in which a U.S. flag carrier and Icelandic shipping company have similar ownership.

Appellees argue that the dictionary definition of competition precludes affiliates from bidding. Black's Law Dictionary, for example, describes "competition" as "[t]he effort of two or more parties, acting independently, to secure the business of a third party by the offer of the most favorable terms." BLACK'S LAW DICTIONARY 257 (5th ed.1979). But this is exactly what all the bidders, including TLI and TLL, did. Even if TLI and TLL colluded and were not acting independent of each other, the participation of other bidders would meet the definition's requirements. Appellees' "plain meaning" argument therefore fails.

We note that the suggestion of collusion (as opposed to mere affiliation) could be cause for concern. It might be called "unfair competition," but even that term admits that a "competition" occurs. And there is a mechanism for protecting against collusive bidding. A Certificate for Independent Price Determination ("CIPD") certifies the independent devel-

opment of a bid. Appellees raised a CIPD issue before the district court, but have not pressed it on appeal.

In *Maximov v. United States,* 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963), a petitioner similarly sought to impose a meaning on a term that it could not bear. Under the Income Tax Convention between the United States of America and the United Kingdom, Apr. 16, 1945, 60 Stat. 1377, 1384, capital gains of a "resident of the United Kingdom" were exempt from taxation by the United States. *See id.* at 49, 83 S.Ct. 1054. The petitioner was trustee of a trust created under Connecticut law by a grantor who was a resident of the United Kingdom. A trust was considered a person under the law of both countries and thus a "resident" of the United States, not the United Kingdom, under the treaty. Petitioner urged that the purpose of the treaty required the opposite result. The Supreme Court disagreed. Reviewing the plain language, the Court could not construe the treaty to effect "so significant a deviation from normal word use or domestic tax concepts." *Id.* at 52, 83 S.Ct. 1054.

This case is not unlike *Maximov.* We cannot, in the name of effectuating the purposes of the Treaty and MOU, read into those documents a meaning of "competition" which would prohibit the bids of separate corporate entities with common ownership. To do so would distort the meaning of the term "competition." If TLI and TLL were one corporation, then the entire shipping trade could not be split between them because the Treaty and MOU contemplate two separate awards to one entity of each country. But TLI and TLL are separate entities, and are entitled to be treated as such. Therefore, we conclude that the Treaty and MOU requirement of a "competition" does not foreclose bids from affiliated companies. To the extent that the term admits of any ambiguity, we will defer to the position of the U.S. Diplomatic Note that the bids did not

create some unnamed creature that was not a "competition."

### C. Icelandic Shipping Companies

■ Our disposition of the meaning of "competition" does not end our discussion of the Treaty. We must also consider whether TLI is an "Icelandic shipping company." As a preliminary point, we make clear that this dispute is not whether TLI is a properly registered Icelandic company, although it appears to be one. Instead, we are asked to decide whether it is an "Icelandic shipping company" as that term in used in the Treaty and MOU. While it could be said these two inquiries, absent other direction, should be identical, we need not decide that issue. We can conclude that whatever the Treaty and MOU require, the interpretation of the U.S. Diplomatic Note is reasonable and is entitled to deference.

The Iceland Diplomatic Note suggests that all Icelandic shipping companies must fulfill four requirements: "experience, technical capability, financial responsibility, and material connection with Iceland." How much of any of these factors is required? The Note says sufficient "to ensure a viable presence of Icelandic shipping companies" in the trade. Unfortunately that is not helpful given that the term "Icelandic shipping company" is used in the "definition" itself. Whichever Icelandic shipping company is awarded the contract will have a viable presence. As the district court feared, this is not a meaningful way for a court to analyze what constitutes an Icelandic shipping company within the meaning of the Treaty. *See Iceland Steamship Co. v. United States Dep't of the Army,* slip op. at 6 n.2, No. 98–2631 (D.D.C. Feb. 3, 1999).

We do recognize the concerns of the government of Iceland. Apparently, when the Treaty was drafted, it was not contemplated that newly formed Icelandic-owned shipping companies would be able to capture the trade. Thus a specific definition of the term was not included. Just as

Rainbow Navigation was formed as a U.S. flag carrier in 1984 to capture to the entire trade under the Cargo Preference Act, TLI was founded by an Icelandic citizen in an attempt to capture the Icelandic portion under the regime established in 1986. However, if Iceland wished the limitation it now seeks, it could have insisted that a more specific definition be included. For example, the U.S. portion of the trade is reserved for "U.S. flag carriers" instead of "U.S. shipping companies."

The parties to the international agreements included no explicit definition. We have no authority for engrafting terms onto the MOU that they did not include. The plain meaning of the words "Icelandic shipping company" does not compel us to find as a matter of law that TLI does or does not qualify for such status. Insofar as there is any ambiguity, we will defer to the reasonable interpretation offered in the U.S. Diplomatic Note. We therefore hold that it was reasonable for the Army to find that TLI is an Icelandic shipping company under the Treaty and MOU.

Because we need only decide the case before us, we do not identify a line between actions that are permitted and those which are prohibited by the Treaty and MOU. We recognize that a reasonable range of choices might exist. There is no call for us to go further.

### III. Solicitation Issues

#### A. Standard of Review

■ Finally, we consider the challenges to the Contracting Officer's responsibility determinations. Because of the special nature of contracting determinations, our review is an especially deferential application of the arbitrary and capricious standard. We clarified the application of the standard to contracting determinations in *Old Dominion Dairy Prods., Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980):

> As stated in *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (Ct.Cl.1974), the ultimate

standard is "whether the Government's conduct was arbitrary and capricious toward the bidder-claimant." Concerning a determination of nonresponsibility, the court in *Keco Industries* specifically stated that contracting officers "have very wide discretion," and that a complaining bidder "would normally have to demonstrate bad faith or lack of any reasonable basis in order to prevail." *Id.* at 1205. In describing the reasonable basis test, the court elsewhere noted that, "although based on external facts and circumstances rather than a showing of animosity toward plaintiff or favoritism for a competitor, this principle is not far removed from the bad faith test; courts often equate wholly unreasonable action with conduct motivated by subjective bad faith." *Id.* at 1204.

*Old Dominion,* 631 F.2d at 960; *see also YRT Servs. Corp. v. United States,* 28 Fed. Cl. 366, 387–88 (1993).

■ As in other agency review contexts, "a procurement decision is not 'irrational' simply because we might have reached a different decision in the first instance." *Elcon Enters.,* 977 F.2d at 1478. But we look for no more than "substantial compliance with applicable law and baseline substantive rationality [because] '[j]udges are "ill-equipped to settle the delicate questions involved in procurement decisions." ' " *Id.* at 1479 (quoting *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 203 (D.C.Cir.1984) (quoting *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978))).

Applying this deferential standard, we conclude that a rational basis existed for the responsibility determinations of the Contracting Officer.

#### B. TLI

■ Although various challenges were advanced below, appellees' primary argument is that the Contracting Officer should not have relied on a tentative letter of credit to one company—TLL—in finding

another—TLI—to be financially responsible. While the basic proposition is appealing, on the specific facts before us we cannot hold that the officer acted improperly. The line of credit letter relied on was addressed to Mr. Rose at TLL, a stockholder of both companies, and stated that the line of credit was based on the bank's relationship with Mr. Rose's family. TLI also provided written assurance to the Army that the letter of credit applied to both companies. And while the letter was "tentative," it does not state what "tentative" means.

Viewing the totality of the evidence, we hold that the Army had a rational basis for finding TLI to be responsible. In fact, before the district court, the Army even suggested that the Contracting Officer could have found that no line of credit was needed at all. *See Iceland Steamship Co. v. United States Dep't of the Army,* slip op. at 13 n.9, No. 98–2631 (D.D.C. Feb. 3, 1999). This suggestion highlights the difficulty of second-guessing the Contracting Officer's determination. We have no basis for requiring that a letter of credit be more than "tentative." And while the fact that the letter of credit was addressed to TLL might be troubling, the ultimate weight given to this piece of information is based on a discretionary weighing of financial risks and rewards by the Contracting Officer.

Furthermore, it is in an agency's self-interest to make proper responsibility determinations. Otherwise, the agency runs the risk of contractor default which could cause "substantial delay and inconvenience." *Keco Indus.,* 492 F.2d at 1206. But in any event, considering the deferential standard of review applied to this type of decision, and the fact that judges are not financial advisors to the United States government, we conclude that there is no basis for overturning the Contracting Officer's finding that TLI was responsible.

## C. TLL

Appellees challenge the Contracting Officer's responsibility determination regarding TLL on the ground that TLL presented insufficient evidence to show a right to control a vessel. The solicitation required "sufficient evidence to establish control or irrevocable right to gain control of the necessary vessels in sufficient time to commence service on [the contract starting date]." TLL submitted four letters from marine companies pledging the availability of vessels. For example, the letter from Tidewater Marine stated:

> This is to confirm that [TLL] has the option to charter the supply boat *Native Dancer....* The maximum charter shall not exceed 180 days. Additional unspecified options shall be mutually negotiated.

> The purpose of the charter is to fulfill a part of [TLL's] obligation to the Joint Traffic Management Office, in the event that the company is awarded the contract.

J.A. at 216. Based on these submissions, the Contracting Officer concluded that TLL would obtain the ships necessary to be a responsible contractor.

Deferring to the expertise of the Contracting Officer in these matters, we find this decision to be rational. We have no occasion to weigh the quantum of evidence needed to establish the legal requirements of an irrevocable option. Considering these letters, we cannot say it was arbitrary for the Contracting Officer to decide that TLL would be able to obtain vessels. Moreover, we note that we have held in a contract action that an irrevocable option can be created despite a paucity of stated terms. *See Ammerman v. City Stores Co.,* 394 F.2d 950, 954–55 (D.C.Cir.1968). Although the letters apparently did not state price terms, we have no information on the typical evidence required by contracting officers, or furnished by prospective charterers. Therefore, we must conclude that the appellees have not established that the Contracting Officer's decision was arbitrary or capricious.

## IV. Conclusion

For the reasons set forth above, we conclude that the Army's decision to award the shipping contracts to TLI and TLL does not require rebidding. Because there are no issues of material fact to be decided, we reverse the judgment of the district court and remand for the entry of summary judgment in favor of appellants.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:

The majority rightly focuses on our narrow standard of review of the Contracting Officer's two responsibility determinations. Although its focus is blurred by the quotation from *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 960 (D.C.Cir.1980), discussing an ill-defined "reasonable basis test," Maj. Op. at 461, in the end my colleagues adhere to the well-established arbitrary and capricious standard of review of administrative action. *See id.* at 461, 462 ("[O]ur review is an especially deferential application of the arbitrary and capricious standard."); *id.* at 461 ("[T]he ultimate standard is 'whether the Government's conduct was arbitrary and capricious.'") (quoting *Old Dominion Dairy Prods., Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C.Cir.1980)).

In any event, even with "an especially deferential application" of an already deferential standard of review, *id.*, we are nevertheless obligated to review the administrative decisions with some scrutiny. The Army regulations mandate that contracts "be awarded to[ ] responsible prospective contractors only." *See* 48 C.F.R. § 9.103(a). My review of the Contracting

Officer's decision leads me to reject his determination of TLI's financial responsibility. In addition, although I concur in the majority holding regarding the Contracting Officer's determination of TLL's operational responsibility, I cannot agree that our standard of review intends nothing more than rubber-stamping the same.

### I.

The regulations governing the financial responsibility determination mandate that a bidder provide information "clearly indicating" it has, or can obtain, adequate financial resources to perform the contract.[1] 48 C.F.R. § 9.103(b) ("In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility."); *see id.* § 9.104–1 ("To be determined responsible, a prospective contractor must ... [h]ave adequate financial resources to perform the contract, or the ability to obtain them."). Evidence of a prospective contractor's ability to obtain required resources "normally consists of a commitment or explicit arrangement." *Id.* § 9.104–3(a). Moreover, the regulations consider affiliated entities like TLL and TLI separately for the purpose of determining financial responsibility. *See id.* § 9.104–3(c).[2]

The majority concludes that there is no basis to overturn the Contracting Officer's finding that TLI was financially responsible. *See* Maj. Op. at 461–62. His determination was based on a letter from the State Bank of Long Island purporting to extend a tentative line of credit. As the majority notes, *see id.*, the letter was addressed to Brandon Rose, a stockholder in

---

1. The solicitation here provided:

   The Government shall require a showing of financial and operational responsibility prior to making an award. The applicable provisions of the FAR [Federal Acquisition Regulation], Sub-part 9.1 require that prior to award, an affirmative determination be made by the Contracting Officer that the

   prospective offeror is responsible and meets the minimum standards specified herein. Joint Appendix (JA) 107–08.

2. Section 9.104–3(c) provides that "[a]ffiliated concerns ... are normally considered separate entities in determining whether the concern that is to perform the contract meets the applicable standards for responsibility."

both TLI and TLL. The majority, however, omits that it was addressed to Rose *at TLL*. Moreover, the letter extended nothing to Rose and nothing to TLI; it merely "tentatively approved" a line of credit to TLL. JA 313. One of the bases for the bank's decision was its relationship with Rose's family. The bank also cited TLL's business plan and made no reference to TLI. Perhaps the State Bank of Long Island would not extend credit equally to an entity like TLI, organized under the laws of another country. Perhaps TLI's financial status or business plan was not as sound as TLL's. I also wonder if the letter "clearly indicat[ed]" the prospect of a line of credit for other companies Rose owned stock in.[3]

Even assuming the letter bears on the determination of TLI's financial responsibility, the letter approved the line of credit only "tentatively." JA 313. The majority discounts the conditional nature of the approval because the letter "does not state what 'tentative' means." Maj. Op. at 462. Indeed, the letter did not detail what conditions must be satisfied before the bank in fact extended credit. But "tentative" means "subject to change or withdrawal" or otherwise "not final." Webster's Third New International Dictionary 2357 (1981). The majority also claims: "We have no basis for requiring that a letter of credit be more than 'tentative.'" Maj. Op. at 462. On the contrary, the standards that govern award of a procurement contract (the FAR, Sub-part 9.1, discussed above) plainly envision that a bidder provide more than a tentatively approved line of credit to an affiliated entity. *See* 48 C.F.R. § 9.103(b) ("In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility.").

Because the letter from the bank neither "clearly indicat[ed]" applicability to TLI nor extended credit to anyone, I would conclude that the Contracting Officer's determination of TLI's financial responsibility was *especially* arbitrary and capricious and that he was bound to "make a determination of nonresponsibility." *Id.*

## II.

The majority omits review of the Contracting Officer's operational responsibility determination regarding TLL. The Army's solicitation mandates that "[n]o offer will be considered for award which does not include sufficient evidence to establish control or irrevocable right to gain control of the necessary vessels in sufficient time to commence service on [contract starting date]." JA 102. Because TLL proffered *no* evidence "establish[ing] control," our review focuses on whether TLL proffered sufficient evidence establishing "an irrevocable right to gain control." *Id.* The majority notes that the Contracting Officer relied on four letters from marine companies pledging the availability of vessels to TLL. It concludes that "[w]e have no occasion to weigh the quantum of evidence needed to establish the legal requirements of [an] irrevocable option." Maj. Op. at 462. I disagree. First, while the majority is no doubt correct that, as a general rule, "judges are ill-equipped to settle the delicate questions involved in procurement decisions," *id.* at 461, the determination of an "irrevocable right to gain control" requires a *legal* conclusion and, thus, a conclusion which judges are presumably adept at making. Moreover, the solicitation provides that an "irrevocable right" is a prerequisite to the operational responsibility determination, JA 102; therefore, finding a bidder to be responsible without an irrevocable right is arbitrary and capricious. In reviewing the

---

**3.** Although TLL provided the Contracting Officer a letter of assurance that the credit applied equally to both companies, TLL did not purport to be speaking for the bank. *See* JA

187. In any event, the regulations provide that affiliated entities are to be considered separately. *See* 48 C.F.R. § 9.104–3(c).

Contracting Officer's responsibility determination under any formulation of the arbitrary and capricious standard, then, we must consider whether the four letters TLL submitted were sufficient to establish an "irrevocable right to gain control of the necessary vessels." JA 102.

Because I believe the four letters could constitute an irrevocable option, *see Ammerman v. City Stores Co.,* 394 F.2d 950 (D.C.Cir.1968); *see generally Restatement (Second) of Contracts* (1979) § 87(2) ("An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice."); 3 Eric Mills Holmes, *Corbin on Contracts* § 11.7 (rev. ed.1996) ("[A]n option contract can be made binding and irrevocable ... by subsequent action ... by the option holder in reliance on the option."), I join the majority in deferring to the Contracting Officer's determination that the letters constituted "sufficient evidence" to establish an "irrevocable right to gain control of the necessary vessels in sufficient time to commence service," JA 102, and that TLL was therefore operationally responsible.

Accordingly, I concur *in toto* in Parts I and II and in Parts III.A and III.C as explained above. I respectfully dissent from Part III.B. My resolution of Part III.B, finding reversible error in the award to TLI, would require remand to the Army for rebidding.